RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0053p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

BRETTON WESTMORELAND,

　　　　　　　*Plaintiff-Appellant,*

　　　*v.*

BUTLER COUNTY, KENTUCKY; ROCKY W. TYREE,
individually,

　　　　　　　*Defendants-Appellees.*

⎤
⎟
⎟
⎟
⎟
⎬　No. 21-5168
⎟
⎟
⎟
⎟
⎦

———————————

Appeal from the United States District Court
for the Western District of Kentucky at Bowling Green.
No. 1:19-cv-00073—Gregory N. Stivers, District Judge.

Argued: October 28, 2021

Decided and Filed: March 24, 2022

Before: CLAY, GIBBONS, and BUSH, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Gregory A. Belzley, BELZLEY, BATHURST & BENTLEY, Prospect, Kentucky,
for Appellant. Charles E. English, Jr., ENGLISH, LUCAS, PRIEST & OWSLEY, LLP,
Bowling Green, Kentucky, for Appellees. **ON BRIEF:** Gregory A. Belzley, BELZLEY,
BATHURST & BENTLEY, Prospect, Kentucky, for Appellant. Charles E. English, Jr., John A.
Sowell, ENGLISH, LUCAS, PRIEST & OWSLEY, LLP, Bowling Green, Kentucky, for
Appellees. Megha Ram, RODERICK & SOLANGE MACARTHUR JUSTICE CENTER,
Washington, D.C., David M. Shapiro, NORTHWESTERN PRITZKER SCHOOL OF LAW,
Chicago, Illinois, for Amicus Curiae.

　　　GIBBONS, J., delivered the opinion of the court in which CLAY, J., joined. BUSH, J.
(pp. 13–33), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

JULIA SMITH GIBBONS, Circuit Judge.   Bretton Westmoreland was arrested and detained at the Butler County Jail, where he was attacked by another detainee for being a "snitch."  Westmoreland sued the jail and Rocky Tyree, an employee, for failure to protect under 42 U.S.C. § 1983.  The district court granted summary judgment to the Butler County Jail and Tyree, holding that because Westmoreland did not suffer a constitutional violation, Tyree was entitled to qualified immunity and the jail could not be held liable.  Westmoreland appeals, arguing the district court used the incorrect test to evaluate his claim.  Because our court recently determined that *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), requires modification of the subjective prong of the deliberate indifference test for pretrial detainees, we vacate the district court's grant of summary judgment and remand Westmoreland's claims for proceedings consistent with *Brawner v. Scott County, Tennessee*, 14 F.4th 585 (6th Cir. 2021).

**I**

On May 27, 2018, Defendant Butler County Jail ("BCJ") booked Plaintiff Bretton Westmoreland on an active bench warrant for failure to appear.  During the booking process, Westmoreland signed a document acknowledging he received and understood the rules of BCJ and his rights as an inmate—including the process to request separation from other inmates if he felt threatened.  That same day, Westmoreland requested to be separated from fellow inmate Jerry St. Clair.  Westmoreland indicated that he knew St. Clair was currently incarcerated at BCJ and that St. Clair believed he was a government informant.  BCJ documented this request for separation, and Westmoreland was assigned to a multi-occupancy general population dormitory with six cellmates that did not share common area with St. Clair.

One week later, around 6:21 P.M. on June 3, 2018, Westmoreland called his mother, Tanya Arnold Sublett, and expressed his concerns that St. Clair was telling other inmates Westmoreland had "told on him."  DE 26-2, Defs.' Mot. Summ. J., Page ID 196.  The next day, St. Clair was permitted to mop floors outside of Westmoreland's cell.  Around 12:22 P.M.,

Westmoreland called Sublett again and told her that St. Clair was near Westmoreland's dormitory and was telling Westmoreland's cellmates that he was a "rat." *Id.* at 196–97. Westmoreland claimed his cellmates became "rowdied up" after hearing this, and one inmate in particular—Ricky Mullikan—became mad. DE 29, Pl.'s Resp. Defs.' Mot. Summ. J., Page ID 243.

After Westmoreland conveyed this information to his mother, Sublett called BCJ and spoke with Tara McMillin, the jail's Class D Coordinator. McMillin worked in the administrative office preparing home and rehab placements for inmates. McMillin testified that Sublett informed her something was going on between Westmoreland and St. Clair, and she was concerned about Westmoreland's well-being in his cell. McMillin checked Westmoreland's records and confirmed that he and St. Clair were housed in separate cells. McMillin completed an incident report about the phone call, wrote down Sublett's phone number, and gave a note to her supervisor, Tyree. In the incident report, McMillin wrote: "I spoke with Jailer Rocky Tyree and explained the issue. I gave him a sticky note with [Sublett's] phone number and asked him to call her." DE 29, Pl.'s Resp. Defs.' Mot. Summ. J., Page ID 245.

Tyree claimed he had spoken to Westmoreland approximately fifteen minutes before McMillin informed him of Sublett's phone call. He stated their conversation lasted for five minutes and occurred in the bullpen, during which he asked Westmoreland directly if he wanted to be moved out of his cell. Tyree claims that Westmoreland replied "No, I'm fine." DE 26-2, Defs.' Mot. Summ. J., Page ID 198. Westmoreland, however, denied having any conversation with Tyree about being moved from the cell. Tyree stated that because he had spoken with Westmoreland, who did not want to be moved, he felt he did not need to follow up on Sublett's phone call. Westmoreland called Sublett again in the afternoon of June 4, and she told him that she had called the jail and Tyree would "take care of everything." DE 29, Pl.'s Resp. Defs.' Mot. Summ. J., Page ID 247.

Around 6:00 P.M. on June 4, 2018, Westmoreland asked Deputy Jesse Kidd if he could be moved. Kidd's incident report indicates that Westmoreland made the request because "he couldn't stand to be in the cell with the other inmates and that they were getting on his nerves." DE 26-2, Defs.' Mot. Summ. J., Page ID 199. Kidd told Westmoreland that the jail did not move

inmates just because they dislike their cellmates and prepared a report documenting the conversation. Westmoreland stated that when he spoke to Kidd, he asked to be moved because he "felt like [his cellmates] were going to do something to [him]." DE 29, Pl.'s Resp. Defs.' Mot. Summ. J., Page ID 247.

Westmoreland testified that things escalated after dinner, when other inmates were egging on Millikan and turning up music. Between 6:00 P.M. and midnight, BCJ deputies visited Westmoreland's dormitory on seven occasions to monitor the inmates. Sometime after midnight, the other inmates shut off the lights, turned up the television, and closed the door. Westmoreland sat on a cooler to see everything, and when he turned to speak with another inmate, Mullikan attacked him from behind. Westmoreland testified that he stood up to defend himself, but two other inmates pushed him away so that Mullikan could strike him again. Mullikan struck Westmoreland with his fist and knocked Westmoreland unconscious. Westmoreland recalled waking up when a guard came into the cell, and the other inmates informed the guard that Westmoreland had slipped in the shower. Westmoreland was reluctant to disclose he had been attacked and initially told Tyree he had fallen in the shower before acknowledging that he had been assaulted by another inmate.

A guard took Westmoreland to the jail's nurse, who examined him, cleaned out his mouth, and stated that Tyree needed to be informed. After Tyree arrived, the nurse and Tyree took Westmoreland to the Ohio County Hospital emergency room, where the hospital determined his jaw was broken and referred him to an oral surgeon. Westmoreland was returned to BCJ and placed in a three-man cell. Westmoreland had two surgeries for his injury: braces and a plate were installed, and his jaw was wired shut for seven to eight months while he subsisted on a liquid diet. He still experiences numbness from the midline of his chin to the mid-right side of his jaw, and his face pops and causes pain while eating.

Westmoreland filed suit against Tyree, McMillin, Kelli Fugate (the Chief Administrative Deputy at BCJ), and BCJ (collectively "Defendants") asserting claims for failure to protect, in violation of the Eighth and Fourteenth Amendments and 42 U.S.C. § 1983; negligence and gross negligence under Kentucky law; and a violation of Ky. Rev. Stat. § 441.045(3) for allegedly releasing him to avoid paying his medical bills. Following discovery, Defendants moved for

summary judgment.   Westmoreland voluntarily dismissed his claims against McMillin and Fugate.

The district court applied a two-part deliberate indifference test to determine whether Tyree was entitled to qualified immunity and granted Defendants' motion for summary judgment.   The court held that under the objective component of the deliberate indifference failure-to-protect claim, Westmoreland established he faced a substantial risk of harm because he had been identified as a snitch, and he subsequently suffered physical harm during an attack. However, under the subjective component, the court held Westmoreland failed to show Tyree knew of the substantial risk of harm.   Because Tyree was not deliberately indifferent, the court held Westmoreland did not suffer a constitutional violation and Tyree was entitled to qualified immunity.   The district court also granted summary judgment to BCJ, holding that a municipality cannot be liable absent an underlying constitutional violation.   Finally, the court dismissed Westmoreland's state law claims without prejudice, declining to exercise its discretionary pendent jurisdiction over state law claims filed in connection with and arising out of the same facts as his § 1983 claim.

## II

The district court's grant of summary judgment is reviewed de novo.  *Equitable Life Assur. Soc'y of the United States v. Poe*, 143 F.3d 1013, 1015 (6th Cir. 1998).  We will affirm the district court if the record "shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[W]e view the factual evidence in the light most favorable to the nonmoving party, and draw all reasonable inferences in that party's favor."  *Burwell v. City of Lansing, Mich.*, 7 F.4th 456, 462 (6th Cir. 2021) (citation omitted).

## III

Qualified immunity shields government actors from civil liability under 42 U.S.C. § 1983 if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  To determine whether an officer is entitled to qualified immunity, a court must evaluate two

independent questions: (1) whether the actor's conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the incident. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

The Eighth Amendment provides an inmate the right to be free from cruel and unusual punishment. U.S. Const. amend. VIII. The Supreme Court has established that "prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (citation omitted). "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." *Id.* at 834. A prison official violates an inmate's rights only if the official is "deliberate[ly] indifferen[t] to inmate health or safety." *Id.* (internal quotation marks and citation omitted). A deliberate indifference claim under the Eighth Amendment has an objective and a subjective component. *Richmond v. Huq*, 885 F.3d 928, 937–38 (6th Cir. 2018). Under the objective component, "[f]or a claim . . . based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. The subjective component requires an inmate to show that the individual defendants (1) were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists"; (2) actually drew the inference; and (3) consciously disregarded the risk. *Id.* at 837, 839; *Mangum v. Repp*, 674 F. App'x 531, 537 (6th Cir. 2017).

The Due Process Clause of the Fourteenth Amendment provides the same protections to pretrial detainees. *See Richko v. Wayne Cnty., Mich.*, 819 F.3d 907, 915 (6th Cir. 2016). This court has "historically analyzed Fourteenth Amendment pretrial detainee claims and Eighth Amendment prisoner claims 'under the same rubric.'" *Richmond*, 885 F.3d at 937 (quoting *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013)). Westmoreland argues, however, that a pretrial detainee's failure-to-protect claim should be governed by a test of objective unreasonableness because the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), eliminates the subjective element of a deliberate indifference claim.

In *Kingsley*, the Court held that, in an excessive-force claim, a pretrial detainee must show only that the officers' use of force was *objectively* unreasonable and need not show the

officers were subjectively aware their use of force was unreasonable.  576 U.S. at 391–92.  In holding that the appropriate standard is objective, the Court reiterated the principle that pretrial detainees' constitutional status differs from that of convicted prisoners.  *Id.* at 397–98, 400. *Kingsley* did not, however, address whether an objective standard applies in other Fourteenth Amendment pretrial detainment contexts.

Following the Court's decision in *Kingsley*, a circuit split emerged: The Second, Seventh, and Ninth Circuits held *Kingsley* required modification of the subjective component for pretrial detainees bringing Fourteenth Amendment deliberate-indifference claims.  *See Darnell v. Pineiro*, 849 F.3d 17, 34–35 (2d Cir. 2017) (deliberate indifference to conditions of confinement); *Miranda v. Cnty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018) (deliberate indifference to an inmate's serious medical needs); *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018) (deliberate indifference to decedent's health or safety).  By contrast, the Fifth, Eighth, Tenth, and Eleventh Circuits retained the subjective component for deliberate-indifference Fourteenth Amendment claims.  *See Cope v. Cogdill*, 3 F.4th 198, 207 & n.7 (5th Cir. 2021) (concluding in a footnote that the court is bound by prior precedent applying a subjective component); *Whitney v. City of St. Louis*, 887 F.3d 857, 860 n.4 (8th Cir. 2018) (reasoning that "*Kingsley* does not control because it was an excessive force case, not a deliberate indifference case"); *Dang by & through Dang v. Sheriff, Seminole Cnty.*, 871 F.3d 1272, 1278 n.2 (11th Cir. 2017) (explaining "[w]e cannot and need not reach this question" because *Kingsley* does not squarely conflict with prior precedent and reasoning that, in any event, the plaintiff had established only negligence, which is still insufficient under *Kingsley*); *Strain v. Regalado*, 977 F.3d 984, 991 (10th Cir. 2020) ("We decline to extend *Kingsley* to Fourteenth Amendment deliberate indifference claims.").

Our court directly confronted the matter in *Brawner v. Scott County, Tennessee*, 14 F.4th 585 (6th Cir. 2021), *reh'g en banc denied*, 18 F.4th 551 (6th Cir. 2021).  In *Brawner*, we "agree[d] with the Second, Seventh, and Ninth Circuits that *Kingsley* requires modification of the subjective prong of the deliberate-indifference test for pretrial detainees."  *Id.* at 596.  In reaching this decision, the court reviewed the history of the deliberate-indifference test, noting that in *Farmer*, the Supreme Court adopted the subjective component of the test for deliberate

indifference under the Eighth Amendment *based on the language and purposes of that amendment*, focusing particularly on "punishments." *Id.* at 594–96 (citing *Farmer*, 511 U.S. at 835–36; 37–38; 40). We held that *Kingsley* presented a "clear delineation between claims brought by convicted prisoners under the Eighth Amendment and claims brought by pretrial detainees under the Fourteenth Amendment," and, accordingly, "applying the same analysis to these constitutionally distinct groups is no longer tenable." *Id.* at 596.

Judge Readler wrote in partial dissent from the *Brawner* majority that whether the deliberate indifference framework governs pretrial detainees' claims after *Kingsley* should not have been decided because it was unnecessary to the outcome of the case. *Brawner*, 14 F.4th at 603–05 (Readler, J., concurring in part and dissenting in part). Judge Readler argued that *Brawner*'s extension of *Kingsley* to deliberate indifference claims should be considered dictum. *Id.* at 604. However, as recently noted in *Greene v. Crawford County, Michigan*, "[t]he *Brawner* majority expressly considered and rejected the suggestion that its extension of *Kingsley* was dictum" and "[w]e are bound by that decision." 22 F.4th 593, 607 (6th Cir. 2022).

Following *Brawner*, a pretrial detainee establishes deliberate indifference by proving "more than negligence but less than subjective intent—something akin to reckless disregard." *Brawner*, 14 F.4th at 596–97 (quoting *Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc)). A defendant must have acted deliberately (not accidentally) and recklessly "in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id.* at 596 (quoting *Farmer*, 511 U.S. at 836). In *Farmer*, the Supreme Court "noted that recklessness could be defined according to an objective standard akin to that used in the civil context, which would not require proof of an official's actual awareness of the harms associated with the challenged conditions." *Darnell*, 849 F.3d at 32.

Here, the district court analyzed Westmoreland's claims against Tyree and BCJ under the Eighth Amendment deliberate indifference standard with both an objective and a subjective prong. The district court rejected Westmoreland's argument that *Kingsley* changed the standard from deliberate indifference to "objective unreasonableness," noting the Sixth Circuit had not yet adopted either view in the existing circuit split on the issue. But our Circuit has now explicitly taken the position that a failure-to-protect claim by a pretrial detainee requires only an objective

showing that an individual defendant acted (or failed to act) deliberately and recklessly. *Brawner*, 14 F.4th at 596.

*Brawner* did not address the application of this standard to individual officers, however, as the county was the only remaining party in that case. Our court has not yet applied the objective standard to a failure-to-protect claim against an individual officer, but it has done so for claims against individual officers for deliberate indifference to an inmate's serious medical needs. *See Greene*, 22 F.4th at 609–14; *Britt v. Hamilton Cnty., et al.*, 2022 WL 405847, at *3 (6th Cir. Feb. 10, 2022); *Hyman v. Lewis*, --- F.4th ---, 2022 WL 682543, at *2 (6th Cir. Mar. 8, 2022). Other circuits have applied the objective standard to a pretrial detainee's failure-to-protect claim against an individual officer. In *Castro*, the en banc Ninth Circuit applied *Kingsley*'s principles to a pretrial detainee's Fourteenth Amendment failure-to-protect claim against an individual officer. 833 F.3d at 1071. The Ninth Circuit explained that to meet the standard of "reckless disregard," the following elements must be met:

(1)    The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;

(2)    Those conditions put the plaintiff at substantial risk of suffering serious harm;

(3)    The defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and

(4)    By not taking such measures, the defendant caused the plaintiff's injuries.

833 F.3d at 1071. Regarding the third element, the Ninth Circuit held that a "defendant's conduct must be objectively unreasonable, a test that will necessarily turn on the facts and circumstances of each particular case." *Id.* (citing *Kingsley*, 576 U.S. at 397 (internal quotations and citations omitted)). The first, second, and fourth elements of this test match the objective prong of the failure-to-protect claim. *See Farmer*, 511 U.S. at 834. The third element parallels the subjective component of the failure-to-protect claim outlined in *Farmer*, but with updated language to comport with the objectiveness required by *Kingsley*. The Seventh Circuit has also applied *Kingsley* in the failure-to-protect context, holding that a subjective requirement "cannot be reconciled with *Kingsley*'s language, reasoning, and reminder to 'pay careful attention to the

different status of pretrial detainees.'" *Kemp v. Fulton Cnty.*, 27 F.4th 491 (7th Cir. 2022). Like the Ninth and Seventh Circuits, and following our own circuit's post-*Kingsley* line of cases, we hold that a defendant officer must act intentionally in a manner that puts the plaintiff at substantial risk of harm, without taking reasonable steps to abate that risk, and by failing to do so actually cause the plaintiff's injuries.

As applied to Westmoreland's claim: First, Tyree made an intentional decision as to Westmoreland's conditions of confinement. When Westmoreland's mother, Sublett, called BCJ and informed McMillin that she thought her son was in danger, McMillin wrote down Sublett's phone number, gave it to Tyree, and asked him to call Sublett. There is a factual dispute about whether Tyree spoke to Westmoreland about being moved. Whether Tyree spoke to Westmoreland or not, he *was* advised by McMillin that Sublett had concerns about Westmoreland's well-being and he determined Westmoreland did not need to be moved. This is an intentional decision about Westmoreland's conditions of confinement, meeting the first element of the objective test.

As to the second element, whether the conditions of confinement put Westmoreland at substantial risk of suffering serious harm, we have recognized that being identified as a "snitch" in prison puts an inmate at substantial risk of assault. *See Comstock v. McCrary*, 273 F.3d 693, 699 n.2 (6th Cir. 2001) (acknowledging a prison psychologist's statement that "a prisoner in prison definitely doesn't want to be labeled a snitch, that's probably the worst label that you . . . could have put on you if you were in prison" (citation omitted)). In *Dale v. Poston*, 548 F.3d 563, 569–70 (7th Cir. 2008), the Seventh Circuit addressed the inherent risk faced by snitches in prison. The plaintiff sued several prison employees, claiming they violated the Eighth Amendment by failing to protect him from an attack by another inmate after he was labeled a snitch, and the court noted it is "common knowledge that snitches face unique risks in prison." *Id.* Here, Westmoreland has established this element by showing that St. Clair identified him as a "rat" in front of his cellmates, DE 29, Pl.'s Resp. Defs.' Mot. Summ. J., Page ID 242, and informed other inmates that Westmoreland had "told on him." DE 26-2, Defs.' Mot. Summ. J., Page ID 196.

The third element of a pretrial detainee's failure-to-protect claim against an individual officer is that the defendant did not take reasonable available measures to abate the substantial risk of serious harm, even though a *reasonable* officer in the circumstances would have appreciated the high degree of risk involved and the obvious consequences of the defendant's conduct. This prong incorporates *Kingsley*'s holding that "the relevant standard is objective not subjective." 576 U.S. at 395. A pretrial detainee need not prove subjective elements about an officer's actual awareness of the level of risk, but he must prove the officer was more than merely negligent; the officer must have acted with "reckless disregard" in the face of "an unjustifiably high risk of harm." *Brawner*, 14 F.4th at 596 (quoting *Farmer*, 511 U.S. at 836).

The district court analyzed Westmoreland's claim using the deliberate indifference test. Although the court held that under the objective prong of a failure-to-protect claim, Westmoreland successfully showed he was incarcerated under conditions posing a substantial risk of serious harm, it found his claim failed at the subjective prong because Tyree "did not possess sufficient knowledge based on [Sublett's] message to infer a substantial risk of harm existed." DE 31, Op., Page ID 292. The district court must analyze Westmoreland's claim under the objective unreasonableness standard outlined in this third element, viewing the facts in the light most favorable to Westmoreland, and determine whether the record is sufficient for a jury to conclude that Tyree was deliberately indifferent to Westmoreland's substantial risk of serious harm. If summary judgment is improper as to Tyree, the court must also address the issue of qualified immunity. *See Burwell*, 7 F.4th at 476.

The fourth element is whether the defendant caused the plaintiff's injuries by not taking reasonable measures. Westmoreland established this element by showing he suffered physical harm as a result of being labeled a snitch after St. Clair identified him as a "rat" in front of his cellmates; his mother, Sublett, called BCJ to ask that actions be taken to protect Westmoreland; Westmoreland was not moved away from his cellmates; and he subsequently suffered a broken jaw and lingering issues as a result of an attack by his cellmate.

We vacate the district court's grant of summary judgment because the analysis of whether Tyree was deliberately indifferent should be solely an objective consideration.[1]  The outcome of this analysis is necessary to determine whether Tyree violated a clearly established constitutional right, or whether he is entitled to qualified immunity.  In turn, whether BCJ is liable for Tyree's actions is contingent on whether a constitutional violation occurred.  Under *Monell*, a municipality can be liable under § 1983 when an official "policy or custom" caused a violation of the plaintiff's constitutional rights.  *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 694–95 (1978).  "If no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983."  *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001) (citation omitted).  Accordingly, Westmoreland's claim against BCJ must be addressed after the district court analyzes the claim against Tyree pursuant to the new standard.  The district court exercised its discretion to dismiss Westmoreland's pendent state law claims under 28 U.S.C. §1367(c) after it granted summary judgment on the federal claims.  As we vacate the grant of summary judgment on the federal claims, we also vacate the dismissal of the state law claims—our normal practice in this setting.  *See Hale v. Boyle Cnty.*, 18 F.4th 845, 855 (6th Cir. 2021) (per curiam).

## IV

We vacate the district court's grant of summary judgment and remand Westmoreland's claims for proceedings consistent with our holding that the deliberate indifference test in a pretrial detainee's failure-to-protect claim is an objective determination.

---

[1]In this conclusion, we are cognizant of the district court's role and the need to consider all the evidence and make all reasonable inferences in the light most favorable to Westmoreland.

———————————

**DISSENT**

———————————

JOHN K. BUSH, Circuit Judge, dissenting. "[C]ourts are particularly ill equipped to deal with the[] problems" of jail administration. *Shaw v. Murphy*, 532 U.S. 223, 229 (2001) (quoting *Procunier v. Martinez*, 416 U.S. 396, 405 (1974)). And "[r]unning a [jail] is an inordinately difficult undertaking." *Turner v. Safley*, 482 U.S. 78, 84–85 (1987). With that reality in mind, I respectfully dissent. The majority invites judicial micromanagement of jailers' daily affairs with a novel test for analyzing pretrial detainees' Fourteenth Amendment failure-to-protect claims. Its decision will create even more confusion in our circuit and for those working in jails. It also reaches the wrong result: even under the majority's test, I would affirm the district court's grant of summary judgment to defendants.

I.

After Bretton Westmoreland failed to appear in court, he was apprehended and detained on May 27, 2018, in the Butler County Detention Center. There, his cell was separate from that of an inmate, Jerry St. Clair, who believed Westmoreland had "ratted" on him during a previous incarceration. R. 25-1, Westmoreland Dep., PageID 140; *see also* R. 26-3, Intake Sheet, PageID 221. On the morning of June 4, St. Clair voiced his accusation—calling Westmoreland a "rat"—while mopping floors outside Westmoreland's cell. R. 25-1, Westmoreland Dep., PageID 142, 156. Westmoreland says that this statement "rowdied up" his cellmates—in particular, Ricky Mullikan and Adrian Baucum. *Id.* at 143. Fearing for his safety, Westmoreland called his mother that same morning and told her that he thought "something [was] going to happen." *Id.* at 143–44. He called her again later that day, and she informed him that she had spoken with Tara McMillin, a coordinator at the jail, who was going to talk to Rocky Tyree, one of the jailers, who would handle the issue. *Id.* at 145. Westmoreland says that he then asked a guard, Deputy Jesse Kidd, to move him from his cell. *Id.* at 144. According to Kidd, Westmoreland told him that "he couldn't stand to be in the cell with the other inmates and that they were getting on his nerves." R. 26-6, Kidd Incident Report, PageID 233. Kidd denied Westmoreland's request to be

moved. The deputy testified that he told Westmoreland that "we could not just move him because he didn't like it." *Id.*

Tyree admits that he received a note from McMillin about Westmoreland's mother's concerns. R. 25-2, Tyree Dep., PageID 162; *see also* R. 26-4, McMillin Incident Report, PageID 224. Yet he claims that only fifteen minutes before receiving that note, he had already spoken to Westmoreland and Westmoreland denied that he wanted to be moved from his cell. R. 25-2, Tyree Dep., PageID 162. Westmoreland, however, claims that this conversation never took place, R. 29, Resp. to Mot. for Summ. J., PageID 246, so we assume it did not for the purposes of his summary judgment motion. *See Jackson v. City of Cleveland*, 925 F.3d 793, 806 (6th Cir. 2019) (citations omitted).[1]

Westmoreland also says that on the evening of June 4, his cellmates began to act more aggressively toward him. R. 25-1, Westmoreland Dep., PageID 146, 156. While they were watching television, Mullikan attacked Westmoreland from behind and broke his jaw. *Id.* at 147–48. How jailers were supposed to have known about an impending assault is unclear. The note from Westmoreland's mother only spoke of general concern because of St. Clair's calling Westmoreland a "rat," not an imminent attack by his cellmates. R. 26-4, McMillin Incident Report, PageID 224 ("She said Inmate Jerry St. Clair was now on the floor and was causing problems."). Even Westmoreland admits that he did not know he was in danger of an attack at that point. Indeed, he explained that it was "a surprise it happened then." R. 25-1, Westmoreland Dep., PageID 158. And even after he was transported to the hospital for treatment of his injuries, the cause of those injuries was not obvious to the jailers. When Tyree asked Westmoreland what happened, Westmoreland first asserted that he had fallen in the shower. *Id.* at 148. Only later did he admit that he had been attacked by his cellmate.

Westmoreland filed a complaint against Tyree, Butler County, and two other jail officials—whom he later voluntarily dismissed—under 42 U.S.C. § 1983 for failure to protect him in violation of the Eighth and Fourteenth Amendments. He also brought Kentucky state-law claims for negligence and gross negligence. The district court granted summary judgment to

---

[1]Westmoreland does concede, however, that Tyree was not responsible for or involved in determining Westmoreland's particular cell or where St. Clair was permitted to mop floors. Oral Arg. at 7:12–7:45.

Tyree and Butler County, the remaining defendants, holding that because Westmoreland had failed to show that Tyree knew of a substantial risk of harm, he had not violated the Constitution. It also declined to exercise its discretionary pendent jurisdiction over his state-law claims. Westmoreland timely appealed.

## II.

Despite the district court's thoughtful application of existing precedent to correctly reject Westmoreland's claims, the majority now vacates that decision with a novel multi-factor test that it imports from the Ninth Circuit. Maj. Op. at 9–11 (citing *Castro v. County of L.A.*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc), *cert. denied*, 137 S. Ct. 831 (2017)). Its admittedly "new standard" diverges from settled precedent as established by both the Supreme Court and this circuit. To illustrate that divergence, I begin by discussing the first principles underlying Westmoreland's claim.

Because Westmoreland is a pretrial detainee, rather than a convicted prisoner, his claim arises under the Fourteenth Amendment rather than the Eighth. Yet a review of the relevant precedents concerning the Eighth Amendment—which have long informed the principles governing detainee claims under the Fourteenth—provides crucial context.

The Eighth Amendment's prohibition against the infliction of "cruel and unusual punishments," U.S. Const. amend. VIII, has been read to require the government to provide reasonable safety to those in its care. *See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989) (citing *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976)). In *Farmer v. Brennan*, the Supreme Court articulated a two-pronged test for determining when a prison official violates the Eighth Amendment by failing to protect an inmate. 511 U.S. 825, 834 (1994). First, the failure to prevent harm must be "sufficiently serious"; in other words, the condition must pose a "substantial risk of serious harm." *Id.* (citations omitted). This requirement has been called the "objective" prong of the test. The second requirement, known as the "subjective" or "deliberate-indifference" prong, requires that the prison official have a "state of mind" that is "'deliberately indifferent' to the inmate's health or safety." *Id.* (cleaned up). Rejecting an invitation to adopt a solely objective test, the Supreme Court made clear that the

deliberate-indifference prong requires proof that the official "knows of and disregards an excessive risk to inmate health or safety." *Id.* at 837. In other words, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and *he must also draw the inference*." *Id.* (emphasis added).

This two-pronged test from *Farmer*, and the duty to protect from harm, were later extended to the pretrial-detainee context. *See DeShaney*, 489 U.S. at 200 (applying the Fourteenth Amendment's prohibition against the "depriv[ation of] any person of life, liberty, or property, without due process of law," U.S. Const. amend. XIV, in the pretrial-detainee context (citing *Youngberg v. Romeo*, 457 U.S. 307, 315–16 (1982))); *see also Beck v. Hamblen County*, 969 F.3d 592, 600–01 (6th Cir. 2020) ("[We] have previously held that *Farmer*'s test for a prisoner's claim under the Eighth Amendment applies 'with equal force' to a pretrial detainee's substantive-due-process claim under the Fourteenth Amendment." (quoting *Richko v. Wayne County*, 819 F.3d 907, 915 (6th Cir. 2016))). Thus, longstanding Sixth Circuit precedent barred a pretrial detainee's recovery against a jailer unless he could show that the jailer subjectively understood the potential for harm.

Then, in *Kingsley*, the Supreme Court modified the subjective prong of the two-part test for excessive-force claims brought by pretrial detainees under the Fourteenth Amendment. *Kingsley*, 576 U.S. at 400. The *Kingsley* Court explained that the issue before it was whether, "to prove an excessive force claim [under the Fourteenth Amendment], a pretrial detainee must show that the officers were *subjectively* aware that their use of force was unreasonable, or only that the officers' use of that force was *objectively* unreasonable." *Id.* at 392 (emphasis added). It outlined two state-of-mind inquiries—the first inquiry is into the official's "state of mind with respect to the bringing about of certain physical consequences in the world," and the second inquiry is into the official's "state of mind with respect to whether his use of force was 'excessive.'" *Id.* at 395. The Supreme Court explained that "pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically,'" so a subjective standard would be inappropriate in response to the second state-of-mind inquiry. *Id.* at 401 (citations omitted). But while it explained that the *degree* of force must be viewed objectively,

the force itself must still be the result of an "intentional and knowing *act*[.]"  *Id.* (emphasis added).

Our circuit recently extended *Kingsley* to modify the subjective prong of the *Farmer* test in the medical-needs context.  *See Brawner v. Scott County*, 14 F.4th 585, 596 (6th Cir. 2021); *see also Greene v. Crawford County*, 22 F.4th 593, 607 (6th Cir. 2022); *Britt v. Hamilton County*, No. 21-3424, 2022 WL 405847, at *3 (6th Cir. Feb. 10, 2022); *Hyman v. Lewis*, No. 21-2607, --- F.4th ---, 2022 WL 682543, at *2–3 (6th Cir. Mar. 8, 2022).  In *Brawner*, the majority posited that "*Kingsley* requires modification of the subjective prong of the deliberate-indifference test for pretrial detainees."  *Brawner*, 14 F.4th at 596.  It concluded that what "is required [for a pretrial detainee] to establish deliberate indifference" is that the official "acted deliberately (not accidentally), but also recklessly 'in the face of an unjustifiably high risk of harm that is either known or so obvious that it *should be known*.'"  *Id.* (emphasis added) (quoting *Farmer*, 511 U.S. at 836); *see also Greene*, 22 F.4th at 606 ("*Brawner* modified the second prong of the deliberate indifference test applied to pretrial detainees to require only recklessness[.]").

The standard for evaluating medical-needs claims as announced in *Brawner* should now be considered binding precedent.  However, I fear that *Brawner*, as applied by the majority opinion, will compound the conflict in our Fourteenth Amendment jurisprudence.  The majority opinion apparently views *Brawner*, using a civil-law recklessness standard, as permitting a path to recovery that is wholly objective, i.e., not contingent on a finding that an official was subjectively aware of some asserted risk.  Maj. Op. at 8–11; *cf. Brawner*, 14 F.4th at 584 (quoting *Estelle*, 429 U.S. at 836–37 (defining civil-law recklessness)).**²**  But this interpretation is inconsistent with *Farmer* and our longstanding adoption of the *Farmer* test for pretrial detainees' failure-to-protect claims.  *See Farmer*, 511 U.S. at 837–38 (rejecting a wholly objective test); *see also Barnes v. Ahlman*, 140 S. Ct. 2620, 2622 (2020) (Sotomayor, J.,

---

**²***Brawner*'s modification of case law has already provoked confusion within our circuit.  *See Britt*, 2022 WL 405847 at *6 ("[The dissent] claims that we have 'misapplie[d] the applicable law' by failing to apply the *Brawner* recklessness standard . . . [b]ut from beginning to end, we have applied the recklessness test for determining the existence of deliberate indifference."); *see also id.* at *7 (Clay, J., dissenting) ("While the majority concedes that Plaintiff's deliberate indifference claims require us to apply an objective test, it nevertheless compares Defendants' actions, and inactions, to prior cases where we applied a subjective test.").

dissenting from the grant of stay) (labeling the *Farmer* test "well-established law" for pretrial detainees' failure-to-protect claims). And as a prudential matter, even assuming *Farmer* does not control here, it is unclear to me how the majority opinion's application of *Brawner* differs from a mere negligence standard. *Compare* Restatement (Third) of Torts: Phys. & Emot. Harm § 3 (2010) (defining "negligence" as when a "person does not exercise reasonable care under all the circumstances" and explaining that "reasonable care" is "conduct that avoids creating an 'unreasonable risk of harm'"), *with Brawner*, 14 F.4th at 598 (applying the new test and concluding that "[the official] recklessly failed to act reasonably to mitigate the risk that the serious medical need posed to [the detainee]"), *and Britt*, 2022 WL 405847 at *3 (describing the relevant inquiry as "whether the defendants acted recklessly in response to a danger, 'even though a reasonable official' in their position would have known about an 'excessive risk'" (citations omitted)). But "liability for *negligently* inflicted harm," as the Supreme Court has explained, "is categorically beneath the threshold of constitutional due process." *Kingsley*, 576 U.S. at 396 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998) (emphasis added)).

True, the *Brawner* test may not facially look like a mere negligence standard because it requires an "excessive risk." But this hedging makes little difference in practice. Jails are inherently risky places to be. *See, e.g.*, Dep't of Justice, Office of the Inspector General, M. Horowitz, Top Management and Performance Challenges Facing the Department of Justice—2021 (2021). The background risk at a jail is elevated as compared to the risk present outside of it—the risk we may think of when arguing that objective recklessness is not a negligence standard. But in a jail, where the risk is already elevated, the standard collapses into de facto negligence. Pretrial detainees in *every* case will now argue that jailers "should have known" some harm would materialize.

Setting aside those concerns for now, though, this case does not present immediately analogous circumstances to those in *Brawner*, which involved a medical-needs claim. Here, a failure-to-protect claim is at issue. There is no compelling reason why the former must govern the latter. As Westmoreland's counsel conceded at oral argument, a medical-needs claim "differs from [] an excessive-force and failure-to-protect claim." Oral Arg. at 1:28–1:39.

No Supreme Court precedent—certainly not *Kingsley* itself—authorizes reimagination of our failure-to-protect analysis.  And we have never applied *Kingsley* outside of the medical-needs context.  So, *Brawner* does not govern here.

III.

*Brawner* does not compel us to ignore binding precedents for a type of claim—failure-to-protect—that was not at issue in *Brawner*.  The discussion below first explains why the majority's new test is not mandated by Supreme Court precedent.  The discussion then describes why the new test is unworkable and logically inconsistent.

A.      Problems Arising from the Majority's Application of *Kingsley* to a Failure-to-Protect Claim

The Supreme Court has not, through *Kingsley* or otherwise, overruled *Farmer* or overruled the subjective component of the deliberate-indifference test for failure-to-protect claims. *See, e.g.*, Maj. Op. at 6–7.  And in *Kingsley*, the Court made clear that its "view that an objective standard is appropriate in the context of *excessive force claims* brought by pretrial detainees pursuant to the Fourteenth Amendment" does not address the standard for other claims brought under that provision. *Kingsley*, 576 U.S. at 402 (emphasis added).  In particular, the *Kingsley* Court stated that its holding was that courts must use an objective standard for determining if "the force deliberately used is . . . excessive." *Id.* at 396 (cleaned up).  And it has stated that we must distinguish excessive-force claims from other types of claims, specifically with respect to requirements for proof. *See Porter v. Nussle*, 534 U.S. 516, 523 (2002).

The Supreme Court also was clear that liability of an official under *Kingsley* is limited to only those situations involving "an intentional and knowing *act*." *Kingsley*, 576 U.S. at 400 (emphasis added); *see also Brawner v. Scott County*, 18 F.4th 551, 555 (6th Cir. 2021) (mem.) (Readler, J., dissenting from the denial of rehearing en banc) (explaining that "deliberate" is defined as "[d]one with or marked by full consciousness of the nature and effects" (citation omitted)).  So, as a purely common-sense matter, it is not clear how *Kingsley*—a case involving an *action*—necessarily applies to cases involving *inaction*. *See id.* at 551–57 (Readler, J.,

dissenting from denial of rehearing en banc); *see also Brawner*, 14 F.4th at 607–08 (Readler, J., concurring in part and dissenting in part).

It is true that the *Brawner* majority did apply *Kingsley* in the medical-needs context, which could involve alleged governmental inaction. But I would not extend *Kingsley* further to apply to a failure-to-protect claim in the absence of a clear Supreme Court directive that we do so. *Agostini v. Felton*, 521 U.S. 203, 237 (1997); *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989) ("[We must] leav[e] to this [Supreme] Court the prerogative of overruling its own decisions."); *RLR Invs., LLC v. City of Pigeon Forge*, 4 F.4th 380, 390 (6th Cir. 2021) ("In the Sixth Circuit, a three-judge panel may not overturn a prior decision unless a Supreme Court decision 'mandates modification' of our precedent." (citing *United States v. Moody*, 206 F.3d 609, 615 (6th Cir. 2000))). *Kingsley*, as applied in *Brawner*, should not be read to likewise modify the test for a failure-to-protect claim, which should still be governed by the *Farmer* test.

B.      Problems Arising from the Majority's Adoption of the Ninth Circuit's *Castro* Test

In addition to my concerns noted above regarding the majority's failure to apply *Farmer*, there are other problems arising from the majority's adoption of a new, four-part test for failure-to-protect claims under the Fourteenth Amendment. Maj. Op. at 9–11. Under this test, borrowed from the Ninth Circuit in *Castro*, a plaintiff must show four elements to prevail on a failure-to-protect claim:

(1)   The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;

(2)   Those conditions put the plaintiff at substantial risk of suffering serious harm;

(3)   The defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and

(4)   By not taking such measures, the defendant caused the plaintiff's injuries.

Maj. Op. at 9 (quoting *Castro*, 833 F.3d at 1071). The majority attempts to clarify its test by stating that it "hold[s]" that a plaintiff must show that "a defendant officer [ ] act[ed]

intentionally in a manner that puts the plaintiff at substantial risk of harm, without taking reasonable steps to abate that risk, and by failing to do so actually cause[d] the plaintiff's injuries." *Id.* at 10.

According to the majority, only element 3 introduces something new by reflecting *Kingsley*'s modification of the subjective component of the *Farmer* test. *See Kingsley*, 576 U.S. at 396. The majority also states that elements 1, 2, and 4 are not new but simply track the objective prong of the *Farmer* test, the component not modified by *Kingsley*. *See* Maj. Op. at 9 ("The first, second, and fourth elements of this test match the objective prong of the failure-to-protect claim." (citing *Farmer*, 511 U.S. at 834)); *but see Farmer*, 511 U.S. at 834 ("Our cases have held that a prison official violates the Eighth Amendment *only when two requirements are met*." (emphasis added)).

In fact, only element 2 tracks the objective component of the *Farmer* test. *See Farmer*, 511 U.S. at 834 (noting that the objective component requires a pretrial detainee to "show that he is [detained] under conditions posing a substantial risk of serious harm"); *see also Montgomery v. Ferentino*, No. 20-3114, 2021 WL 3204843, *2 (6th Cir. Feb. 24, 2021) ("To establish a constitutional violation based on a failure to protect, an inmate must establish that: (1) 'the failure to protect from risk of harm is objectively 'sufficiently serious''; and (2) 'prison officials acted with 'deliberate indifference' to inmate health or safety.'" (quoting *Bishop v. Hackel*, 636 F.3d 757, 766 (6th Cir. 2011) (quoting *Famer*, 511 U.S. at 833–34))). Elements 1 and 4 are wholly new additions to the objective component of the *Farmer* test, and it is not clear what their purposes are, or how they are to be satisfied, for a claim alleging failure to act.

It does not logically follow, as the majority argues, that *Kingsley*, through *Brawner*, requires us to modify the subjective *and* objective components of the *Farmer* test. *See, e.g.*, *Britt*, 2022 WL 405847 at *6 ("That we have relied on pre-*Brawner* cases for other aspects of the deliberate-indifference inquiry is hardly unusual. What would be unusual would be to assume that *Brawner* overruled all of these cases, even those that dealt with other issues and even those that relied on alternative grounds when they addressed the state-of-mind inquiry."). Even if the majority were correct that *Kingsley* and *Brawner* effect faithful application of those precedents for failure-to-protect claims, they would require that we keep the objective prong of the *Farmer*

standard untouched and only modify the subjective prong—not import wholesale a novel test that modifies both. *See Wright v. Spaulding*, 939 F.3d 695, 700 (6th Cir. 2019) ("[This circuit] follows the rule that the holding of a published panel opinion binds all later panels unless overruled or abrogated en banc or by the Supreme Court.").

Indeed, our circuit has never understood *Kingsley* to have modified the *objective* component of the test applied to pretrial detainees' claims. *See Greene*, 22 F.4th at 607 ("[A] plaintiff must 'present evidence from which a reasonable jury could find that (1) that [the detainee] had an objectively serious medical need; and (2) that [the defendant's] action (or lack of action) was intentional (not accidental) and she either (a) acted intentionally to ignore [the detainee's] serious medical need, or (b) recklessly failed to act reasonably to mitigate the risk the serious medical need posed to' the detainee." (citing *Brawner*, 14 F.4th at 597)); *see also Britt*, 2022 WL 405847 at *3.

Furthermore, the majority's new test is not workable as applied to failure-to-protect claims.[3] It purports to implement *Kingsley*, but that case involved alleged *action*—that is, excessive force—not alleged *inaction*, which underlies a failure-to-protect claim. *See Castro*, 833 F.3d at 1068–69. When the affirmative act of excessive force is alleged, as the Supreme Court explained, it does not matter if the official intended to punish a detainee by his actions. The question is if "the force purposefully or knowingly used against him was objectively unreasonable." *Kingsley*, 576 U.S. at 397. In other words, we can infer punitive intent based on an affirmative act's relationship to a legitimate government objective. *See Farmer*, 511 U.S. at 837–38. But *inaction*—when an official *fails* to act—does not raise such an inference. If an official unknowingly fails to act, even if the failure is objectively unreasonable, the official does not violate the Fourteenth Amendment. *Griffith v. Franklin County*, 975 F.3d 554, 571 (6th Cir. 2020) ("Whatever *Kingsley* requires, it is more than negligence." (quoting *Martin v. Warren County*, 799 F. App'x 329, 338 n.4 (6th Cir. 2020))); *see also Lewis*, 523 U.S. at 848

---

[3]Perhaps because of these issues, the Ninth Circuit has since limited its sweeping use of an objective standard when applied to other failure-to-protect contexts. *See, e.g.*, *Herrera v. L.A. Unified Sch. Dist.*, 18 F.4th 1156, 1161 (9th Cir. 2021).

("The Fourteenth Amendment is not a font of tort law to be superimposed upon whatever systems." (cleaned up)).

C.　　　Logical Inconsistences and Ambiguities within the Majority's New Test

Even if we indulged the assumption that *Kingsley* and *Brawner* somehow authorize a reconfiguration of our failure-to-protect jurisprudence, the majority's particular method of doing so contains several deficiencies. The four-part test contains logical inconsistencies and ambiguities. And, not content with these issues, the majority compounds confusion by providing its own gloss on what this four-part test entails. I will address the majority's restatement of its four-part test first.

The majority says that it "hold[s]" that a plaintiff must show that "a defendant officer [ ] act[ed] intentionally in a manner that puts the plaintiff at substantial risk of harm, without taking reasonable steps to abate that risk, and by failing to do so actually cause[d] the plaintiff's injuries." Maj. Op. at 10. This sentence could be read two ways. It could be that the majority's clarification is actually the test the majority wants to adopt. If so, the majority erroneously believes that by using the words "we hold" it transforms its dicta into a holding. *See Freed v. Thomas*, 976 F.3d 729, 738 (6th Cir. 2020) ("[D]ictum is not converted into holding by forceful utterance or by preceding with the words 'We hold that . . . .'" (quoting Pierre N. Level, *Judging Under the Constitution: Dicta about Dicta*, 81 N.Y.U. L. Rev. 1249, 1257 (2006))). A "holding" is defined as "[a] court's determination of a matter of law pivotal to its decision." *Black's Law Dictionary* 849 (10th ed. 2014). The holding in the majority's opinion would be the test that it applies to reach its decision to vacate the district court's decision—the four-element test it adopted from *Castro*. *See* Maj. Op. at 10–11. The second way that the majority's sentence could be read is that it is a clarification of certain elements of its four-part test. But its gloss on elements 1 and 4 of the four-part test creates even more problems, as explained below.

Element 1 of the four-part test requires that "[t]he defendant made an *intentional* decision with respect to the *conditions* under which the plaintiff was confined." Maj. Op. at 9 (emphasis added); *see also id.* at 10. But it is unclear what the majority means by "intentional." On one hand, "intentional" could mean merely that the official's actions or inactions were not accidental.

*Brawner*, 14 F.4th at 597. But then it is unclear how this element is not superfluous given element 3. And accidental actions already did not meet the level of a constitutional violation pre-*Kingsley*. On the other hand, element 1 could exist to try to cabin liability to those actions or inactions that intentionally created the risky conditions under which the plaintiff was confined. This interpretation would require an analysis into the official's state of mind to determine if the official subjectively knew (to *intentionally* make a decision) of the risky conditions. But that, of course, would defeat the majority's nominal goal of permitting liability even when there is merely some risk of which an official "would have" known. *See Castro*, 833 F.3d at 1087 (Ikuta, J., dissenting) ("The majority apparently reinstates the deliberate indifference standard because it cannot explain how an official's failure to act could otherwise constitute an intentional decision. In other words, the majority has simply dressed up the *Farmer* test in *Kingsley* language for no apparent reason; it conflates the two standards only to end up where we started."). Elements 1 and 3's apparent conflict will no doubt engender confusion in any practical application.

In addition, it is not clear which "conditions" element 1 refers to. Is it that the jailer must have placed the detainee in that general condition, like a cell, or a more specialized inquiry—that the jailer placed the detainee in that *particular* cell or with that *particular* person or condition? *But see Farmer*, 511 U.S. at 843. This element also ignores the realities of jail management and operations. It is often not the case that the official that assigns a cell to a detainee is also the same individual responsible for the monitoring of that cell, the transferring of detainees to different cells, hearing detainees' grievances about their cell conditions, or other decisions that arise that affect a detainee's confinement conditions. *See, e.g.*, *Richko*, 819 F.3d at 917–21.

It cannot be the case that element 1 requires each inmate to receive constant attention and thus the micro-management of jails. *See Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 326 (2012) ("[A] regulation impinging on an inmate's constitutional rights must be upheld 'if it is reasonably related to legitimate penological interests.'" (quoting *Turner*, 482 U.S. at 89)); *see also* R. 25-4, McMillin Dep., PageID 178 (testifying that the floor deputies do checks in the Butler County Detention Center "at least every hour, and it could have been more frequent"); *see generally* R. 26-5, Inmate Check Sheet. Not only would this be an

inappropriate intrusion into jails, but it would also be impractical.  *See Florence*, 566 U.S. at 326 ("[S]afety and order at these institutions requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face.").  After all, jails admit over eight million inmates a year.  *See, e.g.*, Dep't of Justice, Bureau of Justice Statistics, T. Minton & Z. Zeng, Jail Inmates in 2020—Statistical Tables (2021).

As noted, the majority attempts to "clarify" element 1 by stating that what is required for a constitutional violation is that "a defendant officer [ ] act[ed] intentionally in a manner that puts the plaintiff at substantial risk of harm."  Maj. Op. at 10.  This clarification suffers from the same ambiguity as element 1.  This restatement could be read to require merely more than accidental actions or, by contrast, could be read to necessitate a full subjective analysis.  *See supra* pp. 23–24.  And, regardless, this restatement is in conflict with element 1.  Instead of requiring an intentional decision with respect to the pretrial detainee's conditions, this restatement requires an intentional *manner* that puts the detainee at risk.  As the majority does not apply this restatement to the facts in reaching its decision, it does not further explain what this means.

Element 3 of the majority's four-part test is also logically inconsistent.  Similar to the *Brawner* test, element 3 requires that "[t]he defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious."  Maj. Op. at 9; *see also id.* at 11.  Yet as explained above, this element is not consistent with Supreme Court precedent and the precedent of our circuit.  *See supra* pp. 19–20.  And, like the *Brawner* majority, today's majority fails to explain how it has not simply instituted a de facto negligence standard under the color of "civil recklessness."  *See supra* pp. 17–18.

Last, element 4 is a confusing addition.  It facially omits a proximate causation requirement.  *See* Maj. Op. at 9 ("By not taking such measures, the defendant caused the plaintiff's injuries."); *see also id.* at 11; *Burrage v. United State*s, 571 U.S. 204, 212 (2014) ("Where there is no textual or contextual indication to the contrary, courts regularly read phrases like 'results from' to require but-for causality.").  But our precedent for § 1983 claims requires *proximate* causation—not merely cause-in-fact.  *See Marvaso v. Sanchez*, 971 F.3d 599, 606–07 (6th Cir. 2020) (stating that a plaintiff must establish proximate causation, which is a question of

foreseeability). So, unless the majority's reference to causation is actually a reference to *proximate* causation, it is unclear how the majority's test is consistent with basic principles of § 1983 jurisprudence.[4]

But even if the majority means proximate causation, the true scope of its test is still far from clear. The majority may mean that only a single official may be held liable for a failure-to-protect incident, since only that official's omission was *the* singular, proximate cause of the injury. That interpretation would make some sense, given that the *Castro* test was itself based on a *Kingsley*-inspired excessive-force instruction. *Cf. Castro*, 833 F.3d at 1060; *Kingsley*, 576 U.S. at 393–94. And in the context of some of our excessive-force and negligence analyses, we treat the official who inflicted the force as *the* proximate cause of the harm, even if some other official's omission was a cause-in-fact. *See, e.g.*, *Smith v. County of Lenawee*, 600 F.3d 686, 692 (6th Cir. 2010). By contrast, however, the majority may be silently codifying a much more expansive notion of proximate cause, in which multiple officials may *all* be held liable for their respective inaction. *See contra Cabaniss v. City of Riverside*, 231 F. App'x 407, 413 (6th Cir. 2007) ("Only Carlton may be liable for excessive force because he was the officer to administer the pepper spray and was assisted by no one else."). If the latter interpretation is true, it would underscore not only the sweeping nature of today's decision, but also its inconsistency with circuit precedent. Nothing about *Brawner*, and certainly nothing about *Kingsley*, authorizes modification of the usual causation standards to permit that scores of bystanding officials be held liable for their supposed omissions. And neither *Kingsley* nor *Brawner* purported to change our analyses with respect to the objective component of our tests.

Ducking the question of what the causation standard is under this four-part test, the majority then expands element 4, requiring that the defendant officer's failure "to do so *actually cause*[*d*] the plaintiff's injuries." Maj. Op. at 10. According to Black's Law Dictionary, "actual cause" is "but-for cause" or "cause-in-fact." *Black's Law Dictionary* 43, 265 (10th ed. 2014). If this reading of the majority's standard is accurate, it is inconsistent with our long-standing

---

[4]This is true even for medical-needs claims under the Fourteenth Amendment, where the pretrial detainee must show that the official was the proximate cause of the "substantial risk of harm," even if not the proximate cause of the ultimate injury or death. *See Blackmore v. Kalamazoo County*, 390 F.3d 890, 899–900 (6th Cir. 2004); *see also Est. of Owensby v. City of Cincinnati*, 414 F.3d 596, 604 (6th Cir. 2005).

§ 1983 jurisprudence. *See Marvaso*, 971 F.3d at 606–07. Whatever the standard is, it is highly unclear, and the majority does not attempt to explain what this standard is or how it would be applied. Maj. Op. at 11.

Notwithstanding these concerns, the majority claims that Westmoreland has established each of the four elements. *Id.* at 10–11. I respectfully disagree. Even accepting the validity of the new test, Westmoreland has not satisfied many of its requirements, as explained below.

IV.

Under 42 U.S.C. § 1983, Westmoreland must show that (1) Tyree violated his constitutional right and (2) that the right was "clearly established at the time" of the violation. *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). Under the majority's new test, Westmoreland would need to prove each of the four elements of that test in order to show that Tyree violated his "clearly established" constitutional right. Maj. Op. at 9–11. Yet his claim fails to satisfy at least elements 1, 3, and 4.[5]

A.    Westmoreland Shows No Evidence that Tyree Intentionally Failed to Move him from his Cell

Element 1 of the majority's test concerns whether Tyree had made an "intentional decision with respect to the conditions under which [Westmoreland] was confined." Maj. Op. at 10. It is unclear what the majority means by "intentional." Does this element require that Tyree had to intentionally, and not accidentally, fail to move Westmoreland? *See id.* ("[Tyree] determined Westmoreland did not need to be moved."). Or does this element require more specific decisions—that Tyree put Westmoreland in that particular cell or placed him in the cell with Mullikan? If the latter, there are no allegations that Tyree placed Westmoreland in that particular cell or specifically with Mullikan. *See, e.g.*, Appellant's Br. at 8. If the former, the evidence still does not establish that Tyree intentionally failed to move Westmoreland from his

---

[5]I am inclined to agree with my colleagues that Westmoreland likely has proof to satisfy element 2—the condition "put [Westmoreland] at a substantial risk of suffering serious harm"—as being identified as a "snitch" would put him at substantial risk of assault. Maj. Op. at 10 (citing *Comstock v. McCrary*, 273 F.3d 693, 699 n.2 (6th Cir. 2001)).

cell. Accepting Westmoreland's version of events as true, Westmoreland did not tell his mother he wanted to be moved from his cell, nor did he tell Tyree. Westmoreland presents no evidence showing that Tyree made an intentional decision to not move him from his cell. Whatever element 1 requires, Westmoreland lacks proof to satisfy it.**[6]**

B.      Westmoreland Shows No Evidence that a Reasonable Official in the Same Circumstances would have Appreciated the High Level of Risk Involved—Making the Consequences of Failing to Act Obvious

Westmoreland claims that Tyree fell short of his duty to protect him at three different times. First, when Tyree was informed that Westmoreland's mother called to express concern about her son's safety, he never followed up with Westmoreland. Appellant's Br. at 11–12. Next, when Westmoreland told Deputy Kidd that he feared his cellmates would "do something" to him, Tyree did not move him from his cell. *Id.* at 12. And finally, assuming that Tyree did talk to Westmoreland, he should have had that conversation out of earshot of Westmoreland's cellmates. *Id.* at 10–11, 18–19. Westmoreland concludes that Tyree knew of the risk leaving him in his cell posed and still did not move him. *Id.* at 17–18.

However, Westmoreland presents no evidence that he ever told Tyree—assuming he spoke to him—or his mother that he needed to be moved because he feared he was in danger from his cellmates. He proffers no evidence that Tyree knew that Westmoreland told Kidd he was concerned about his cellmates. Last, even assuming that Tyree did not speak to Westmoreland, St. Clair was not a cellmate of Westmoreland's, so Tyree was not objectively unreasonable in leaving Tyree in his cell—a cell that did not house St. Clair.

Westmoreland himself admits as much. When asked about the attack, Westmoreland testified that he was "surprise[d]" it had happened when it did and that Mullikan had not threatened him before the attack. R. 25-1, Westmoreland Dep., PageID 157–58. He also stated that he never asked to be transferred to another cell, except in his conversation with Deputy

---

**[6]**The majority does not apply its restatement of element 1—"a defendant officer must act intentionally in a manner that puts the plaintiff at a substantial risk of harm"—to the facts in this case. Maj. Op. at 10. But even if it had, Westmoreland has failed to present evidence showing that Tyree intentionally acted in a manner that put him at a substantial risk of harm.

Kidd, which Tyree testified he was not aware of prior to the incident. *Id.* at 156; R. 25-2, Tyree Dep., PageID 164–65.

Attempting to circumvent these issues, Westmoreland tries to link together a chain of events—that he would have told Tyree he feared harm from his cellmates if Tyree had pulled him out to speak to him and that Tyree still would have left him in this cell. But all Westmoreland can show is that his mother was concerned generally about his wellbeing, which was passed on to Tyree, and that his cellmates were getting on his nerves. *See, e.g.*, R. 31, Memo. Op. & Order, PageID 292 ("Westmoreland's case at best is that Tyree knew Westmoreland's mother was concerned generally about her son's wellbeing because St. Clair told Westmoreland's cellmates he was a rat."); *see also* R. 25-3, Fugate Dep., PageID 169 ("[Westmoreland's mother] was concerned over Jerry St. Clair."). Westmoreland does not offer any evidence that he identified the cellmate he was concerned about, his cellmates in particular, or any other evidence that would show that he communicated to the jail officials that he was in danger in his cell because of St. Clair's accusation. *See Kemp v. Fulton County*, No. 21-1079, --- F.4th ---, 2022 WL 575719, at *5 (7th Cir. Feb. 25, 2022) ("The defendants also argue persuasively that Kemp did not present any evidence showing that any of them was on notice of a serious risk of harm to him. Kemp admitted that he never reported his verbal disagreement with [his cellmates] or the ensuing threats to Jail employees, and that prior to the beating, all four men had cohabited peacefully for months.").

In short, Westmoreland asks us to require jail officials to read minds. His attack, while unarguably terrible and traumatic, and Tyree's alleged failure to talk to him are not enough to prove that Tyree violated his constitutional rights. Whatever the majority's element 3 requires, it must be more than negligence. *See Kingsley*, 576 U.S. at 396 (citations omitted). And Westmoreland's proof does not meet even that threshold.

C.      Westmoreland Shows No Evidence that Tyree was the But-For or Proximate Cause of his Injuries

Element 4 requires that Tyree "caused" Westmoreland's injuries by failing to take "such measures." Maj. Op. at 9; *see also id.* at 11. The majority explains that

> Westmoreland established this element by showing he suffered physical harm *as a result* of being labeled a snitch after St. Clair identified him as a 'rat' in front of his cellmates; his mother, Sublett, called BCJ to ask that actions be taken to protect Westmoreland; Westmoreland was not moved away from his cellmates; and he subsequently suffered a broken jaw and lingering issues as a result of an attack by his cellmate.

*Id.* at 11 (emphasis added). In other words, Tyree did not move Westmoreland from his cellmates after St. Clair identified him as a snitch and Westmoreland's jaw was broken by his cellmate. If element 4 requires proximate causation, it is clear that Westmoreland has not offered evidence to satisfy it. In any sense of the word "causation," these events are too tenuous to meet the requirement of proximate cause. *See, e.g.*, *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 701 (2011) ("Common-law formulations [of proximate cause] include, [ ] the 'immediate' or 'nearest' antecedent test; the 'efficient, producing cause' test; the 'substantial factor' test; and the 'probable,' or 'natural and probable,' or 'foreseeable' consequence test." (quoting Smith, *Legal Cause in Actions of Tort*, 25 Harv. L. Rev. 103, 106–21 (1911))). It is not a foreseeable reaction that leaving Westmoreland in a cell—a cell that he did not request a floor deputy to move him from until later in the day, a cell that did not house St. Clair, and a cell that Westmoreland never expressed fear about to Tyree—would cause Westmoreland to be attacked. *See Marvaso*, 971 F.3d at 607. It does not logically follow that Westmoreland's attack was a foreseeable event when Westmoreland himself was "surprised" on the timing of the attack.[7] Westmoreland does not present evidence to support a finding of element 4.[8]

## V.

Even assuming Westmoreland could meet each of the majority's four elements to show that Tyree violated his constitutional right, he would still need to show that such a right was

---

[7]Compare this to *Castro*, where the Ninth Circuit explained that there was sufficient evidence to support element 4. *Castro*, 833 F.3d at 1073 ("[The official] failed to respond to [the detainee]'s banging on the window in the door of the cell. Jail video of the hallway showed [the detainee] pounding on his cell door for a full minute, while [the official] remained unresponsive, seated at a desk nearby. [The official] failed to respond fast enough to [an arrestee's] inappropriate touching of [the detainee]."); *contra Kemp*, 2022 WL 575719 at *6 ("Without any evidence that. . . [the official's] decision not to wear a hearing aid led to [the detainee]'s injuries, a jury could not conclude that [the official]'s actions were objectively unreasonable.").

[8]The majority does not apply its creation of an "actual causation" standard to the facts in the case here. Maj. Op. at 10–11.

"clearly established at the time" of the alleged violation. *See Wesby*, 138 S. Ct. at 589 (citation omitted). "Clearly established" means that the law at the time was "sufficiently clear"; put simply, that the "existing law . . . placed the constitutionality of the officer's conduct beyond debate." *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (cleaned up)). In other words, the rule must be "settled law" and "precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Id.* at 590 (citations omitted). "It is not enough that the rule is suggested by then-existing precedent." *Id.*

As my colleagues concede, the standard under which we analyze pretrial detainees' failure-to-protect claims under the Fourteenth Amendment is anything but clear. *See* Maj. Op. at 7–9. The federal appellate circuits are split on the applicability of *Kingsley*. Our own circuit has never "applied the objective standard to a failure-to-protect claim against an individual officer[.]" *Id.* at 9. And, as the district court accurately explained, we had "yet to alter the standard for failure to protect claims and [ ] continued to apply the deliberate indifference standard." R. 31, Mem. Op. & Order, PageID 287 n.2. Westmoreland cannot show that his right was clearly established at the time of Tyree's alleged inactions. "So long as the alleged violation has not been clearly established, the officers receive qualified immunity and the suit can be dismissed." *Baxter v. Bracey*, 751 F. App'x 869, 871 (6th Cir. 2018), *cert. denied*, 140 S. Ct. 1862 (2020).

Indeed, it is definitionally impossible to deny qualified immunity to Tyree when adopting a new test on appeal. *See Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) (per curiam) ("Neither [appellee] nor the Court of Appeals identified any Supreme Court case that addresses facts like the ones at issue here. Instead, the Court of Appeals relied solely on its precedent in *LaLonde*. Even assuming that Circuit precedent can clearly establish law for purposes of § 1983, LaLonde is materially distinguishable and thus does not govern the facts of this case."); *City of Tahlequah v. Bond*, 142 S. Ct. 9, 12 (2021) (per curiam) ("Neither the panel majority nor the respondent have identified a single precedent finding a Fourth Amendment violation under similar circumstances. The officers were thus entitled to qualified immunity."). The Supreme Court has reminded us time-and-time again that we ignore this requirement at our own peril. *See, e.g.*, *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014). It is time we heed its warning.

VI.

As for Butler County, Westmoreland has waived his § 1983 claim against it. Appellant's Br. at 7 n.1 ("Plaintiff no longer appeals the District Court's dismissal of his 42 U.S.C. § 1983 claims against Defendant Butler County."). "[W]aiver is the 'intentional relinquishment or abandonment of a known right.'" *United States v. Montgomery*, 998 F.3d 693, 697 (6th Cir. 2021) (cleaned up). And "we may not review waived claims at all." *United States v. Jackson*, 995 F.3d 476, 484 (6th Cir. 2021) (quoting *United States v. Hall*, 373 F. App'x 588, 591–92 (6th Cir. 2010) (citation omitted)). But the majority states that the district court "must" analyze "Westmoreland's claim against BCJ" after it "analyzes the claim against Tyree[.]" Maj. Op. at 12.

The majority's resurrection of Westmoreland's claim against Butler County distorts our proper role as neutral adjudicators. Indeed, "courts are essentially passive instruments of government." *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (quoting *United States v. Samuels*, 808 F.2d 1298, 1301 (8th Cir. 1987) (Arnold, J. concurring in denial of reh'g en banc)). We can only decide questions presented by the parties. *See id.* (citation omitted). And Westmoreland affirmatively waived his appeal on his claim against Butler County. Westmoreland asked this Court to apply the *Kingsley*-modified test to his claim against Tyree only, a case he was aware of prior to filing his appeal, *see Patterson v. State of Alabama*, 294 U.S. 600, 606 (1935), and "our system 'is designed around the premise that [parties represented by competent counsel] know what is best for them, and are responsible for advancing the facts and argument entitling them to relief.'" *Sineneng-Smith*, 140 S. Ct. at 1579 (quoting *Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part and concurring in judgment)); *see also Wood v. Milyard*, 566 U.S. 463, 472–73 (2012). I would affirm the district court's judgment on Westmoreland's claim against Butler County.**⁹**

---

**⁹**Even if Westmoreland had not waived his claim, he forfeited it. Butler County's liability is not even mentioned—besides for one sentence—in either of Westmoreland's briefs, let alone raised in developed arguments. *See Jones Bros., Inc. v. Sec'y of Lab.*, 898 F.3d 669, 677 (6th Cir. 2018) (noting that this circuit has "repeatedly held that a party forfeits any allegations that lack developed argument"). And even if we had authority to review such a claim against Butler County, it would still fail for lack of an underlying constitutional violation. *See Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001).

VII.

"[Judges] have a natural tendency to believe that their individual solutions to often intractable problems are better and more workable than those of the persons who are actually charged with and trained in the running of the particular institution under examination." *Bell v. Wolfish*, 441 U.S. 520, 562 (1979). But we must confine ourselves to finding constitutional violations only after applying our longstanding analyses in this area to the facts before us and leave the management of jails to those better capable. I believe the majority applied the wrong test to reach the wrong result. For the foregoing reasons, I respectfully dissent.