RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0246p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

REBEKAH BUETENMILLER; SAMANTHA BILLS; STACEY
GLASS,

                      *Plaintiffs-Appellants*,

    *v.*

MACOMB COUNTY JAIL, et al.,

                      *Defendants*,

WILLIAM HORAN; CORRECT CARE SOLUTIONS, LLC;
WELLPATH, LLC; MACOMB COUNTY, MICHIGAN,

                      *Defendants-Appellees*.

No. 22-1103

───────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:20-cv-11031—David M. Lawson, District Judge.

Decided and Filed: November 18, 2022

Before: McKEAGUE, THAPAR, and READLER, Circuit Judges.

───────────────

## COUNSEL

**ON BRIEF:** Caitlin E. Malhiot, MARKO LAW, PLLC, Detroit, Michigan, for Appellants. John A. Schapka, James M. Surowiec, MACOMB COUNTY CORPORATION, Mount Clemens, Michigan, for Macomb County Appellees. Richard W. Warren, Erica L. Jilek, MILLER, CANFIELD, PADDOCK AND STONE, P.L.C., Detroit, Michigan, for Appellee Wellpath, LLC.

———————————

**OPINION**

———————————

CHAD A. READLER, Circuit Judge.   Dr. Steven Cogswell sexually assaulted three women at the Macomb County Jail while working as the jail's medical care contractor. Cogswell was fired and eventually convicted of second degree criminal sexual conduct.   The women filed federal and state civil claims against Cogswell, his employer, Macomb County, and a corrections officer, alleging that defendants knew of Cogswell's assaults before they were reported.   Due to the absence of evidence supporting this allegation, we affirm the district court's grant of summary judgment to defendants.

**I.**

Wellpath, a health care service company, contracted with the Macomb County Jail to provide on-site medical staff and services.   Wellpath assigned employee Dr. Steven Cogswell to work at the jail.   While there, he sexually assaulted three inmates—Samantha Bills, Rebekah Buetenmiller, and Stacey Glass—during their visits to the medical clinic.   (Appellants' brief does not spell Rebekah's last name consistently.   We use the district court action spelling.   Fed. R. App. P. 12(a).)   Cogswell saw Bills four times in the medical unit, Buetenmiller and Glass once each.

During their visits, Cogswell stretched a white privacy screen across the doorway before assaulting the inmates.   None of the women called out for help or otherwise indicated to the jail staff that anything untoward was occurring.   Bills, however, recounted one instance where she purported to see an unidentified officer "glance through the little crack of the white curtain [and give] kind of like a head nod," which Bills interpreted as the officer saying to Cogswell "I got your back."   Bills was left with the feeling that "a jail officer at least had 'suspicion' about what was going on."

Wellpath had a policy that "every patient that we treat [be] afforded privacy of care," but "if there was a sensitive exam going on, then there would be a chaperone."   At some point during Cogswell's tenure, Macomb County Officer William Horan, who was assigned to the medical

clinic, reported to Wellpath's nursing director and a Wellpath paramedic that Cogswell was potentially violating this policy by seeing patients unchaperoned while using the privacy screen. So, at Horan's request, the nursing director "pop[ped] [her] head in" to see Cogswell. When she did, she saw "nothing out of the ordinary[ or] suspicious going on."

Included in the record are three surveillance video recordings of the medical clinic waiting area: two corresponding to when Bills was assaulted, and one to Buetenmiller. The videos have no sound. One shows there was no officer on duty in the medical unit while Cogswell sexually assaulted Bills, as Horan's shift had ended. Another shows Horan standing near his desk, walking around the waiting area, and conversing with a woman waiting in the clinic. The third shows Buetenmiller leaving the medical clinic area, at which point Cogswell leaned down and said something to Horan before the two exited the video frame.

Days after their assaults, Buetenmiller and Glass reported the incidents to the jail. Wellpath learned of the reports the day they were made. The company immediately informed Cogswell not to report to work. And following an investigation, his employment was terminated. Cogswell would later be convicted of second degree criminal sexual conduct.

Based upon the events just described, Bills, Buetenmiller, and Glass sued Cogswell, Horan, Macomb County, and Wellpath for violations of state and federal law. Relevant here are three sets of claims asserted by the inmates. Two of those were brought under 42 U.S.C. § 1983—claims against Horan for violating the Eighth and Fourteenth Amendments, and claims against the County and Wellpath alleging *Monell* municipal liability. The third are state law claims against Wellpath.

A default judgment was entered against Cogswell. The remaining defendants moved for summary judgment. The district court granted their motion, a ruling plaintiffs now challenge on appeal.

## II.

We review the district court's grant of summary judgment de novo. *Stein v. Gunkel*, 43 F.4th 633, 639 (6th Cir. 2022) (citations omitted). Summary judgment is appropriate when no

reasonable jury could find for the nonmoving party based on the evidence. *Id.*; Fed. R. Civ. P. 56(a). We view the video evidence in the light it depicts and all other evidence in the light most favorable to plaintiffs. *Stein*, 43 F.4th at 639; *Scott v. Harris*, 550 U.S. 372, 380–81 (2007).

*Bills's And Buetenmiller's Eighth Amendment Claim Against Horan.* Two inmates allege that Horan failed to protect them despite knowing that Cogswell had previously assaulted the inmates, in violation of the Eighth Amendment's prohibition against cruel and unusual punishment. To succeed on their claims, the inmates must show that (1) the deprivation alleged is objectively, sufficiently serious and (2) while engaging in the conduct at issue, Horan had a "sufficiently culpable state of mind," one that was "deliberate[ly] indifferen[t]" to inmate safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citation omitted). No party takes issue with the first prong, so we turn to the second, deliberate indifference. Horan was deliberately indifferent if he (1) was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, (2) drew the inference, and (3) disregarded the excessive risk to inmate safety by failing to act. *Id.* at 837. The inmates may demonstrate those elements in "the usual ways, including inference from circumstantial evidence." *Id.* at 842.

Reading inferences in their favor, the inmates nonetheless fail to satisfy their evidentiary burden. Both acknowledge that they did not call out for help, nor did they complain directly to Horan about their assaults, admissions that make a finding of deliberate indifference on Horan's part exceedingly unlikely. *See Bishop v. Hackel*, 636 F.3d 757, 770–71 (6th Cir. 2011) (holding that plaintiffs failed to make out a triable issue of fact as to whether an officer exhibited deliberate indifference in part because the officer who had worked in the jail health unit did not "hear any complaints or conversations or arguments"). The best the inmates can do is point to Bills's speculation that Horan was aware of something "suspicious" going on. Even so, knowledge of something "suspicious" is not akin to demonstrating awareness of a specific risk of sexual assault. *Cf. Jane Doe v. Jackson Loc. Sch. Dist. Bd. of Educ.*, 954 F.3d 925, 933–34 (6th Cir. 2020) ("To be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, a public official must know more than a *general* risk of harm. The official must know of the *specific* risk that later develops.") (cleaned up). All things considered,

the inmates lack evidence showing that Horan was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]." *See Farmer*, 511 U.S. at 837.

Even if Horan was aware of Cogswell's conduct, the inmates have not offered evidence showing that Horan "disregard[ed]" any risks to their safety by "failing to act." *Id.* at 836. The record, in fact, reveals the opposite. Horan notified Cogswell's superiors that a chaperone may be needed during Cogswell's examinations. He went so far as to ask the nursing director to "pop [her] head in." At that point, Horan was not required to do more. Any further invasion of Cogswell's examinations, keep in mind, risked interfering with the practice of medicine, something Horan was not authorized to do. *See Mitchell v. Hininger*, 553 F. App'x 602, 608 (6th Cir. 2014) (holding that a health service administrator was not deliberately indifferent to an inmate's request for medical care in part due to her "lack of responsibility for overseeing" his medical care).

The inmates offer a variety of responses. First, they emphasize Horan's acknowledgment that he is responsible for the well-being and safety of inmates. But a broad recognition of one's job duties is not tantamount to conceding knowledge of specific facts amounting to a substantial risk of serious harm to an inmate. *Cf. Jane Doe*, 954 F.3d at 934 ("The official must know of the *specific* risk . . . .").

Much the same is true for Horan's reports to Wellpath. At most, those reports show Horan's knowledge that Cogswell was alone with patients. *See id.* Knowledge of potential policy violations, however, is not enough to prove knowledge of a substantial risk of sexual assault. *See id.*

The inmates next point to the videos capturing aspects of their visits to Cogswell. Those also barely move the evidentiary needle. Start with Buetenmiller's video. It shows Horan sitting at his desk, listening to Cogswell, and leaving the room behind him, everyday activities of an officer stationed at the medical clinic. Then consider Bills's videos. The first shows that Horan was not on duty during Bills's assault, rendering it irrelevant as to a claim against Horan. And the second, much like Buetenmiller's, shows only mundane activities by Horan: standing near his desk, walking around the room, and conversing with an awaiting patient.

Finally, Bills spotlights her testimony about the "head nod" she saw an officer give Cogswell through the privacy screen. Of course, it is not clear that Bills is referencing Horan as the nodding officer. And even if so, Bills's interpretation of the event, without more, is speculation at best. *See K.V.G. Props., Inc. v. Westfield Ins. Co.*, 900 F.3d 818, 823 (6th Cir. 2018) ("[A] party may not avoid summary judgment by resorting to 'speculation[ or] conjecture . . . .'" (citation omitted)). All told, there is insufficient evidence to survive summary judgment on the Eighth Amendment claims against Horan.

*Glass's Fourteenth Amendment, Failure To Protect Claim Against Horan.* We turn next to pretrial detainee Glass's failure to protect claim against Horan. Because Glass was a pretrial detainee at the time of the events in question, her claim is governed by the Fourteenth Amendment, rather than the Eighth. *See Greene v. Crawford County*, 22 F.4th 593, 606 (6th Cir. 2022); *see also Westmoreland v. Butler County*, 35 F.4th 1051, 1051–52 (6th Cir. 2022) (Bush, J., dissenting from denial of rehearing en banc) (noting the difficulties that arise in applying "a standard that changes an official's liability for the same action for two individuals with differing trial statuses housed in the same facility"). By way of background, it bears noting that for many years we applied *Farmer*'s two-prong test to failure to protect claims both by pretrial detainees (under the Fourteenth Amendment) as well as convicted prisoners (under the Eighth Amendment). More recently, we held that the reasoning in our *Brawner* decision (rather than *Farmer*) now controlled with respect to affirmative duties to act concerning a pretrial detainee's well-being. *Greene*, 22 F.4th at 607. That development has significance in that *Brawner* "modified" *Farmer*'s subjective prong to incorporate a reasonable officer standard in the context of a claim for deliberate indifference to serious medical needs. *Id.* at 606 (citing *Brawner v. Scott County*, 14 F.4th 585, 592 (6th Cir. 2021)).

This legal evolution also informs our analysis of Fourteenth Amendment failure to protect claims. Today, we employ a four-prong test for resolving these claims. *See Westmoreland v. Butler County*, 29 F.4th 721, 729 (6th Cir. 2022). Under that test, an officer violates the Fourteenth Amendment when (1) he acts intentionally "with respect to the conditions under which the plaintiff was confined," (2) those conditions "put the plaintiff at substantial risk"

of harm, (3) he does not take reasonable steps to abate that risk, and (4) by failing to do so he actually causes the plaintiff's injuries. *Id.*

Glass's claim fails from the start. *Westmoreland* offers an example of the first prong's application. The claims there, pursued by a detainee who was attacked by another detainee, turned on the allegation that jail officials should have recognized the dangers posed to the first detainee by the second. *Id.* We held that a reasonable juror could conclude that officials knew about those dangers because the plaintiff's mother informed jailers that "she thought her son was in danger." *Id.* Being advised of "concerns about [the plaintiff's] well-being" and choosing to do nothing in light of those concerns, we explained, amounted to an "intentional decision about [the plaintiff's] conditions of confinement, meeting the first element." *Id.*

But the evidence in this case is less persuasive than that in *Westmoreland*. Glass, remember, did not inform Horan that she "was in danger." *See id.* And any concerns Horan may have had about Cogswell's potential policy violations were largely allayed when Wellpath's nursing director "pok[ed] [her] head in" and determined that "nothing suspicious" was going on with Cogswell. *Cf. id.* (finding an intentional decision where the officer was advised that there were concerns about the plaintiff's safety and those concerns were not later refuted). All things considered, Glass's claim fails to satisfy *Westmoreland*'s first prong.

Monell *Claims Against Macomb County And Wellpath*. In the district court, Buetenmiller, Bills, and Glass also brought *Monell* claims against Macomb County and Wellpath, alleging that both failed to train and supervise Cogswell. *See Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658 (1978). In their opening brief, however, any argument in that respect is virtually absent. All that can be found is a conclusory assertion that Wellpath "fail[ed] to supervise" Cogswell. Conspicuously absent is any citation to *Monell*. Those shortcomings are fatal. It is insufficient "for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) (citation omitted). And in instances where "[i]ssues [are] adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation," we consider them forfeited. *Id.* (citation omitted). That is the case here.

*State Law Claims.* The inmates assert two varieties of Michigan state law claims against Wellpath. Begin with their sexual harassment claims under the Elliott-Larsen Civil Rights Act. The Act prohibits denying "an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of . . . sex." M.C.L.A. § 37.2302. The inmates are correct that, in this statutory setting, discrimination because of sex includes "sexual harassment." *Id.* § 37.2103(i). To demonstrate as much, the inmates must show that Wellpath's "agent made submission to the proscribed conduct a term or condition of obtaining public services." *Hamed v. Wayne County*, 803 N.W.2d 237, 244 (Mich. 2011). But if Wellpath is not "vicariously liable for the acts of its agent under traditional principles of respondeat superior, the [inmates'] claim[s] under [Michigan's Civil Rights Act] fail[] as a matter of law." *Id.*

The inmates' tort claims against Wellpath also rest on the assertion that Wellpath is liable for Cogswell's acts under a respondeat superior theory. Part and parcel of a respondeat superior claim, of course, is proof that the agent was acting within the scope of his employment. *See id.* at 244–45. And that does not describe sexual assault, conduct "intended solely to further the employee's individual interests," not the principal's. *Id.* at 244; *see also Zsigo v. Hurley Med. Ctr.*, 475 Mich. 215, 231 (2006) ("[P]laintiff has failed to establish that defendant Hurley Medical Center is vicariously liable for the sexual conduct of its nursing assistant who was clearly not acting within the scope of his employment when he engaged in acts of sexual misconduct with plaintiff.").

In view of the roadblock Michigan law puts in place, the inmates ask us to apply Vermont's interpretation of scope of employment instead. But they did not make this same request in district court, meaning the argument is forfeited. *See Greco v. Livingston County*, 774 F.3d 1061, 1064 (6th Cir. 2014). So too for the inmates' argument that Wellpath had "constructive notice" of the risk of harm to Cogswell's patients. As that argument spans just one sentence in the inmates' brief, it is hard to classify it as anything but perfunctory, meaning it is deemed forfeited in this Court. *McPherson*, 125 F.3d at 995–96.

\*          \*          \*          \*          \*

Cogswell was held liable for his criminal conduct.  But his victims have failed to offer a viable case for civil liability against third parties arising out of that conduct.  Accordingly, we affirm the judgment of the district court.