RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 25a0276p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
─────────────────

BLACK FARMERS AND AGRICULTURALISTS ASSOCIATION, INC.; THOMAS BURRELL; MARY FERGUSON; CLAUDETTE JACKSON; MAUZIE FURLOW; ALLIE TILLIS,

>   *Plaintiffs-Appellants*,

> No. 24-5119

*v.*

BROOKE ROLLINS, Secretary of the United States Department of Agriculture; ZACH DUCHENEAUX, Administrator for the United States Department of Agriculture's Farm Service Agency,

>   *Defendants-Appellees*.
─────────────────

Appeal from the United States District Court for the Western District of Tennessee at Memphis.
No. 2:23-cv-02527—Sheryl H. Lipman, District Judge.

Argued: January 30, 2025

Decided and Filed: October 8, 2025

Before: WHITE, READLER, and MATHIS, Circuit Judges.
─────────────────

## COUNSEL

**ARGUED:** Percy Squire, PERCY SQUIRE, Columbus, Ohio, for Appellants. Jack Starcher, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Percy Squire, PERCY SQUIRE, Columbus, Ohio, for Appellants. Charles W. Scarborough, Casen B. Ross, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.

READLER, J., delivered the opinion of the court in which MATHIS, J., concurred. WHITE, J. (pg. 14), delivered a separate opinion concurring in part and dissenting in part.

———————————

**OPINION**

———————————

READLER, Circuit Judge.   The Black Farmers and Agriculturalists Association and several individual members (together "the Farmers") sued the U.S. Department of Agriculture, challenging the agency's policy of disallowing applications to one of its programs filed on behalf of deceased relatives, which the Farmers wished to do here.   The district court dismissed their lawsuit, holding that the relevant statute required the USDA to accept applications from living farmers only.   We agree, and thus affirm the district court.

I.

Recognizing the long history—legislative, legal, and otherwise—that precedes today's case, the following is a truncated version of those developments.   Relevant then and now is the fact that the USDA's programmatic offerings include initiatives that make loans available to farmers.   At times, the agency has been accused of racial bias in its lending programs, including by black farmers.   In the 1990s, a group of black farmers sued the USDA over these allegations. The agency settled, paying about 15,000 black farmers more than $1 billion.   *Pigford v. Glickman* (*Pigford I*), 185 F.R.D. 82, 113 (D.D.C. 1999); Cong. Rsch. Serv., RS20430, *The* Pigford *Cases: USDA Settlements of Discrimination Suits by Black Farmers* 3, 6 (2013).

Concerns later arose that not all eligible farmers had been paid.   So Congress created a cause of action allowing late-filing eligible farmers to revive their "*Pigford*" claims.   Cong. Rsch. Serv., *supra*, at 7.   These "*Pigford II*" claims were then consolidated and settled, with the USDA paying about 34,000 black farmers almost $1.25 billion, an amount Congress appropriated to fund the new settlement.   *Id.* at 7–8 (citing *In re Black Farmers Discrimination Litig.* (*Pigford II*), 820 F. Supp. 2d 78 (D.D.C. 2011)).

In 2021, the COVID-19 pandemic prompted Congress to target farm-lending discrimination through affirmative legislation rather than in response to private lawsuits.   In the American Rescue Plan Act of 2021, Congress appropriated money to help "socially disadvantaged farmers"—a term the statute defined by using the farmer's race.   Pub. L. No. 117-

2, tit. 1., subtitle A., § 1006(b)(5), (c)(3), 135 Stat. 4, 14 (2021); *see* 7 U.S.C. 2279(a)(5).  Due to this racial classification, a parallel provision of the Act quickly fell to constitutional equal protection challenges, foreboding a similar fate for § 1006.  *See Holman v. Vilsack*, 117 F.4th 906, 910 (6th Cir. 2024) (collecting cases).

That brings us to the statute at issue here.  Section 22007 of the Inflation Reduction Act of 2022 repealed and replaced § 1006 by using past discrimination, rather than race, as the key metric for award-eligibility purposes.  Pub. L. No. 117-169, tit. II, subtitle C, § 22007, 136 Stat. 1818, 2021–23 (2022).  Specifically, § 22007(e) appropriated $2.2 billion "to provide financial assistance . . . to farmers . . . determined to have experienced discrimination . . . in [USDA] farm lending programs."  *Id.* § 22007(e), 136 Stat. at 2023.

To disburse these funds, the USDA created the Discrimination Financial Assistance Program.  The Program, in turn, established various eligibility criteria, one of which lies at the heart of this case:  Applications "[r]eport[ing] only discrimination against an individual who was deceased at the time of the application" were deemed "facially ineligible."  USDA, *DFAP Validation Review Guide (Version 1.12)*, at 8 (2024) [hereinafter *DFAP Guide*], https://perma.cc/K3L6-8MCS; *accord* First Am. Compl., R. 41 PageID 338.

This requirement excludes the "legacy claims" that the Farmers wish to file on behalf of their deceased ancestors who suffered USDA farm-lending discrimination.  That prompted the Farmers to sue the USDA, seeking an injunction that would force the Program to accept legacy claims.  The district court, however, denied the motion for a preliminary injunction and granted the government's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  The Farmers appealed this decision.

Six months later, they also moved for an emergency injunction pending appeal, seeking to stop the USDA's processing of applications.  *See* Fed. R. App. P. 8.  A panel of our Court denied the motion without prejudice because the Farmers failed to show that the district court had denied their motion, as required by Federal Rule of Appellate Procedure 8.  *See* Fed. R. App. P. 8(a)(1)(C), (2)(A)(i)–(ii).  The district court subsequently did so, and the Farmers renewed their motion.

II.

We review the Rule 12(b)(6) dismissal de novo, accepting the complaint's well-pleaded factual allegations as true and testing whether they support a plausible claim for relief. *See Darby v. Childvine, Inc.*, 964 F.3d 440, 444 (6th Cir. 2020) (citing *Johnson v. Morales*, 946 F.3d 911, 917 (6th Cir. 2020); *Binno v. Am. Bar Ass'n*, 826 F.3d 338, 345–46 (6th Cir. 2016)). Because we affirm the district court's final judgment on the merits, we need not address the Farmers' parallel request for preliminary injunctive relief. *See Adams v. Baker*, 951 F.3d 428, 429 (6th Cir. 2020) (per curiam).

Before turning to those merits, we note that the only claim before us is the Farmers' challenge to the legacy-claim exclusion under both the Administrative Procedure Act, 5 U.S.C. §§ 551–559, 701–706, and the Fifth Amendment's Due Process Clause, U.S. CONST. amend. V. The Farmers forfeited the other issues they raised in district court—including their challenges to the application's complexity and filing deadline, as well as to the USDA's refusal to accept applications based on housing loans—by not briefing them on appeal. *See Joseph Forrester Trucking v. Dir., Off. of Workers' Comp. Programs*, 987 F.3d 581, 593 (6th Cir. 2021) (citing *Courser v. Allard*, 969 F.3d 604, 621 (6th Cir. 2020)).

A. The Farmers primarily challenge the USDA's exclusion of legacy claims under the APA, characterizing that decision as "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). But this attack puts the cart before the horse. That APA standard of review applies to an agency's policymaking choices, for example in rulemaking. *E.g.*, *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41 (1983). When Congress delegates policymaking authority, we use arbitrary-and-capricious review to determine whether the agency engaged in "reasoned decisionmaking within th[e] boundaries" of the delegation. *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2263 (2024) (citation modified). But we cannot reach that issue without first undertaking a threshold task: We must "fix[] the boundaries of the delegated authority" by "independently interpret[ing] the statute." *Id.* (citation modified). In other words, before asking whether the USDA acted arbitrarily in deciding not to accept claims based on discrimination faced by deceased farmers, we must first determine whether Congress gave it discretion to accept those claims.

1.  It did not, as § 22007(e)'s plain language shows.  There, Congress instructed the USDA "to provide financial assistance . . . to farmers . . . determined to have experienced discrimination."  § 22007(e).  Unpacking that language, the deceased "farmers," at least as suggested by the complaint here, "experienced discrimination."  *Id.*; *see* First Am. Compl., R. 41, PageID 340.  That leaves the question whether an award under § 22007(e) would provide "assistance" to these farmers.

Finding no statutory definition for that term, we turn to the word's ordinary meaning. *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012).  "Assistance" means "[t]he action of helping or aiding in an undertaking or necessity."  *Assistance*, 1 *Oxford English Dictionary* 715 (2d ed. 1989); *accord Assistance*, *Black's Law Dictionary* (12th ed. 2024).  "Help," in turn, means "[t]o furnish . . . with what is serviceable to [one's] efforts or . . . needs."  *Help*, 7 *Oxford English Dictionary* 126 (2d ed. 1989); *see also Help*, Merriam-Webster (last visited Aug. 28, 2025) ("[T]o provide (someone) with something that is useful or necessary in achieving an end.").  And to "aid" similarly means "to give . . . support."  *Aid*, 1 *Oxford English Dictionary* 273 (2d ed. 1989); *see also Aid*, Oxford English Dictionary Online (last visited Aug. 28, 2025) (adding "to relieve from difficulty or distress").

Taking all of this together, "assistance" seemingly has two meanings, one task-based and one need-based.  When it comes to tasks, "assistance" is something useful or necessary to achieving an end or completing an undertaking or effort.  In terms of need, "assistance" provides support or relief to someone in a present state of difficulty, distress, or necessity.  Crucial here is that each definition points to the present and future.  Viewed in that light, "assistance" addresses help with either a yet-to-be-completed task or a yet-to-be-satisfied need.

With this understanding in mind, we agree with the USDA that the Program may not accept claims made on behalf of deceased farmers.  The Program's "financial assistance," remember, must go "to [the] farmers" who "experienced discrimination."  § 22007(e).  For the Farmers' claims to qualify, the money would have to "assist[]" a deceased farmer who suffered discrimination.  *Id.*  That is impossible.  It goes without saying that a deceased farmer is not engaged in an activity that money can help complete, nor does the farmer suffer any need that money can help relieve.  Money, in short, cannot "assist[]" a deceased farmer.  § 22007(e).

Because deceased farmers do not satisfy this statutory requirement, the USDA was required to reject applications filed on behalf of that group.

Fairly read, the Farmers' claims are better understood to seek "compensation" for past harm to deceased farmers, not "assistance." To "compensate" means "[t]o counterbalance, make up for, [or] make amends for," *Compensate*, 4 *Oxford English Dictionary* 601 (2d ed. 1989), often by "mak[ing] an appropriate and usually counterbalancing payment" which, for example, "compensate[s] . . . victims for their loss," *Compensate*, Merriam-Webster (emphasis omitted) (last visited Aug. 28, 2025). That describes what the Farmers seek here, as any payment to a now-deceased farmer's estate based on discrimination suffered during the farmer's life would be solely for making amends for wrongs previously suffered, not for "assist[ing]" the farmer in the here and now.

On this point, we note that other courts to consider similar provisions have held that a grant of "financial assistance" contemplates the "provision of a subsidy to an entity, as opposed to providing compensation." *McMullen v. Wakulla Cnty. Bd. of Cnty. Comm'rs*, 650 F. App'x 703, 707 (11th Cir. 2016) (per curiam) (citation modified); *see also Harpole v. Ark. Dep't of Hum. Servs.*, 820 F.2d 923, 928 (8th Cir. 1987) (noting that a statute written to "provide financial assistance" is not intended "as a means of seeking compensation" for past "injur[ies]"). We find this distinction persuasive. After all, Congress is seemingly well aware of the difference between "compensation" and "assistance," typically using the former term when it wishes to provide backward-looking payments to make up for past wrongs or pay existing debts, as legislative enactments from the recent and more distant past reflect. *See, e.g.*, One Big Beautiful Bill Act, Pub. L. No. 119-21, tit. X, pt. II, subtitle C, § 100201, 139 Stat. 72, 394 (2025) (describing program of "compensation" for "radiation exposure" (citation modified)); Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. No. 114-187, tit. III, § 316(a)(1), 130 Stat. 549, 584 (2016) (providing "compensation for actual, necessary services rendered"); Longshoremen's and Harbor Workers' Compensation Act, Pub. L. No. 69-803, ch. 509, § 8, 44 Stat. 1424, 1427 (1927) (providing "[c]ompensation for disability" caused by work as a longshoreman). Take as an example Congress's response to the Japanese American internment saga. There, our nation's legislature designed a program to issue "appropriate

compensation" for the "enormous damages" caused by past discrimination, 1988 Civil Liberties Act, Pub. L. No. 100-383, § 2(a)–(b), 102 Stat. 903, 904, and explicitly designated that such "payments" can be made on behalf of "deceased persons," *id.* § 105(a)(7), 102 Stat. at 907. "[W]here Congress knows how to say something but chooses not to, its silence is controlling." *In re Griffith*, 206 F.3d 1389, 1394 (11th Cir. 2000) (en banc) (citation modified); *see also Thompson v. United States*, 145 S. Ct. 821, 827 (2025) (similar). In sum, as the district court aptly stated, "[t]he use of the word assistance, rather than compensation, supports the idea that the funding was intended to provide prospective relief for living farmers, rather than to compensate the families of deceased ones." Order Den. Pls.' Second Mot. Prelim. Inj. and Granting Defs.' Mot. Dismiss, R.74, PageID 741.

The structure of § 22007 confirms as much. The other subsections of § 22007, it bears noting, also appropriate money for forward-looking purposes. *See* § 22007(a) ("[T]o provide outreach, mediation, financial training, . . . and other technical assistance . . . ."); § 22007(b) ("[T]o improve land access . . . ."); § 22007(c) ("[T]o fund . . . equity commissions . . . ."); § 22007(d) ("[T]o support and supplement agricultural research, education, and extension . . . ."). What is more, § 22007 had its genesis in a COVID-19-relief statute, which likewise addressed a wide range of pandemic-related issues on a uniformly forward-looking basis. *See generally* Pub. L. No. 117-2, 135 Stat. 4.

Finally, comparison to the two *Pigford* class action settlements, which accepted claims from deceased farmers and which the Farmers cite as the measure of appropriate USDA action, only highlights the daylight between Congress's choice to grant "assistance" and the Farmers' desire to transform this appropriation into "compensation." In those class action settlements, the fundamental underlying claim was that "the government *had wronged* generations of African American farmers and must provide *compensation*." *Pigford I*, 185 F.R.D. at 101 (emphasis added). In other words, those farmers sought a backward-looking payment to make up for harm they suffered. Federal law, in turn, allowed the class action to include claims for compensatory damages brought by survivors of deceased farmers who suffered discrimination. *See Weatherford U.S., L.P. v. U.S. Dep't of Lab., Admin. Bd.*, 68 F.4th 1030, 1036–37 (6th Cir. 2023) (describing federal common law rule that "claims to compensate the plaintiff . . . survive a

party's death" (citation modified)).  So it makes perfect sense that the USDA accepted claims from the survivors of the deceased *Pigford* farmers.  But § 22007(e), by comparison, provides "assistance," not "compensation," and thus creates no cause of action that could survive the claimant's death.

Accordingly, the USDA, in this instance, could not have accepted claims made on behalf of deceased farmers.  This resolves the Farmers' APA challenge, obviating any need to address their numerous arguments under the arbitrary-and-capricious standard.

2.  The Farmers seek to avoid the statute's text in many ways.  Many of these arguments, it bears noting, emerged for the first time at oral argument.  By failing to argue these points in their appellate briefing, the Farmers forfeited them.  *See Joseph Forrester Trucking*, 987 F.3d at 593.  But even if we excuse the forfeiture, none of these points changes our straightforward analysis.

a.  First, the Farmers claim that "assistance" does not have its ordinary meaning.  Instead, they argue that the previous enactment of § 1006 in the American Rescue Plan Act of 2021 purportedly defined "assistance" so broadly as to encompass grants to deceased farmers, a definition, the Farmers say, we should bring forward to inform our interpretation of § 22007(e).  First, it is unclear why a definition that did not survive from the previous enactment into the now-binding law should be given any weight.  Normally we would read such an omission as demonstrating Congress's intent to disavow the prior definition, not embrace it.  *See, e.g.*, *Phillips v. Ct. of Common Pleas*, 668 F.3d 804, 810 (6th Cir. 2012) (noting that "courts operate on the assumption that Congress acts intentionally" when it "omits" "particular language" while "amend[ing]" a statute (citation modified)).  But even putting that objection aside, § 1006 contained no definition of "assistance."  The Farmers' argument appears to be premised on that statute's subsection heading: "ASSISTANCE."  § 1006(b), 135 Stat. at 13.  The heading, however, does not introduce a statutory definition of the term "assistance"; instead, it merely introduces the list of assistance programs created under the statute.  *Id.*  Further inspection reveals that the heading serves simply to distinguish this list from subsections (a), which describes the "APPROPRIATION" that funds these programs, and (c), where Congress in fact did provide "DEFINITIONS"—and in doing so, it bears noting, conspicuously omitted one for "assistance."

§ 1006(a), (c), 135 Stat. at 13–14.  In short, § 1006 does not define "assistance" any more than § 22007 does, leaving us to use the term's ordinary meaning.  *See Taniguchi*, 566 U.S. at 566.

b.   At oral argument, the Farmers provided their first explanation of how money can "assist" a deceased farmer.  The money, the Farmers explained, "puts" the dead farmer's "heirs in position to benefit from the [farmer's] efforts," and thus "assist[s] the estates," which "would have been in a position to bequeath finances to their heirs" if they received the money.  Oral Argument at 08:42–09:09.  Even if this argument had been briefed, it would not go far.  The Farmers seemingly envision the money "assisting" the estates bequeathed to the deceased farmer's heirs.  Yet an estate is merely "[t]he property that one leaves after death."  *Estate*, *Black's Law Dictionary* (12th ed. 2024).  That collection of property is not itself a "farmer[]" who "experienced discrimination."  § 22007(e).  So even if a grant would assist an estate in some sense, that effect still falls outside the statute's instruction to assist "farmers" themselves.  *Id.*

c.   The Farmers also emphasize potential practical issues that might arise from interpreting "assistance" to exclude claims on behalf of deceased farmers.  While those points may carry weight in the legislative setting, they are largely misplaced here.  After all, on issues of statutory interpretation, "[e]ven the most formidable policy arguments cannot overcome a clear statutory directive," such as the one in § 22007(e).  *Badgerow v. Walters*, 142 S. Ct. 1310, 1321 (2022) (citation modified).

Even were we positioned to evaluate possible policy impacts tied to congressional action, the concerns raised might not pose much of a problem.  Consider the purported unfairness in not accepting claims from a farmer whose operations are still affected by past discrimination against his deceased parents or grandparents.  That the farmer cannot submit a claim on behalf of his deceased ancestors, however, does not mean he cannot file a claim for himself.  For example, as the government conceded at oral argument, a farmer who is the "current holder" of a debt that resulted from alleged past discrimination may apply to the Program on that basis.  *DFAP Guide*, *supra*, at 66; *see* Oral Argument at 15:50.  This tracks our understanding of the statute:  The farmer, now subject to the terms of a discriminatory loan, has himself "experienced discrimination" and is thus eligible for "assistance."  § 22007(e).  Or if, on the other hand, a loan was denied to the farmer's ancestors because of discrimination, the farmer seemingly could

apply on his own behalf and explain in his application how discriminatory acts toward his predecessors *also* constituted discrimination against him personally. *See DFAP Guide*, *supra*, at 66 (rejecting application when it "*only* asserts discrimination against an individual who is now deceased" (emphasis added)); Oral Argument at 16:16 (government conceding that "if they were able to file an application and explain how they themselves experienced discrimination, then they could do that"). In any event, even if some farmers fall in neither bucket and thus have no statutory claim available, that result is tied to Congress's design, a choice we may not second guess.

Nor does the Program's allegedly inconsistent decision to accept claims from "potential producers"—those who never farmed but merely intended to do so before farm-lending discrimination prevented it—convince us to read the statute any differently. That oddity, if true, arises from the USDA's interpretation of "farmers," which is not at issue in this case, rather than from our straightforward reading of "assistance." *See DFAP Guide*, *supra*, at 10 (justifying this choice based on the "the statutory reference to 'farmers'" because "would-be farmers" "demonstrate sufficient connection . . . to farming . . . to qualify for a loan"). In another case, we could debate whether this reading of "farmers" is correct. But here, it sheds no light on the meaning of "assistance."

Finally, the Farmers make hay over the fact that the Program accepted applications from living farmers who subsequently passed away while rejecting applications from farmers who were deceased when their application was submitted. That assertion, however, is not supported by any allegations in the complaint or elsewhere in the record. Nor, in any event, does the argument make much sense. Barring an ability to read the future, on what basis should the USDA have rejected applications from farmers who were going to die *after* they applied? In the end, neither this nor any of these other alleged practical inconsistencies can overcome the statute's plain command. *See Badgerow*, 142 S. Ct. at 1321.

d. Falling short on the policy front, the Farmers turn to statutory purpose. To their minds, our reading contravenes Congress's intent "to compensate for decades of racial discrimination in USDA farm lending programs." Appellant Br. 26. What controls here, of course, is the text. And on that score, the lone purported purpose Congress revealed in enacting

§ 22007(e) was to provide "assistance," not "compensation." *See Arangure v. Whitaker*, 911 F.3d 333, 345 (6th Cir. 2018) ("Congress addresses [its] purposes by negotiating, crafting, and enacting statutory text."). The Farmers' speculation to the contrary cannot overcome the text's command.

Were we inclined to entertain the Farmers' purpose argument, it nonetheless runs contrary to the structure and background here. Recall that the rest of § 22007 concerns forward-looking, pandemic-inspired assistance programs. And the backward-looking component of the farm-lending-discrimination problem has already been addressed by the two *Pigford* settlements, where Congress allocated more than $2 billion to settling the compensatory claims the Farmers now seek to re-litigate. *See* Cong. Rsch. Serv., *supra*, at 6–7. Indeed, many applications accepted under the Program were based on "the same discrimination during the same timeframe as successfully claimed in" the *Pigford* settlements. *DFAP Guide*, *supra*, at 17 (bold omitted). And more than $12 million was left unclaimed after *Pigford II*, suggesting that all claimants who could be compensated have been. *See Cy Pres Funds*, In Re Black Farmers Discrimination Litigation Settlement, https://www.blackfarmercase.com/CyPres.aspx (last visited Aug. 28, 2025); *see also In re Black Farmers Discrimination Litig.*, No. 08-0511, 2018 WL 6434766, at *1, *4 (D.D.C. Dec. 7, 2018) (describing dispute over *cy pres* distributions).

In sum, if one were looking for an overarching statutory purpose, as the Farmers ask us to do, the only one apparent from § 22007(e), its statutory context, or its history is to provide forward-looking help for pandemic-affected farmers—not, as the Farmers suggest, to provide backwards-looking compensation to farmers already compensated by the *Pigford* settlements.

e. The Farmers next invoke their statutory right to "inherit . . . property" on the "same" basis as other "citizens of the United States." *See* 42 U.S.C. § 1982 ("All citizens of the United States shall have the same right . . . as is enjoyed by white citizens . . . to inherit . . . real and personal property.") According to the Farmers, interpreting § 22007(e) in the manner we have violates § 1982 by denying the heirs of black farmers the right "to inherit" property on the same terms as the heirs of white farmers. 42 U.S.C. § 1982. Three problems with this assertion immediately come to mind. One, the argument seemingly assumes, without support, that every person who "inherit[s]" land from a discriminated-against black farmer will also be black. *Id.*

Two, § 1982, like § 22007(e), is merely a statute. A previous statutory enactment, no matter how revered, cannot supplant the will of a subsequent Congress, *see Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 135 (1810), especially a statute that speaks more specifically to the situation at hand, *see RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) ("It is a commonplace of statutory construction that the specific governs the general." (citation modified)). So in the event of a conflict, § 22007(e) prevails.

Three, and more to the point, our reading of § 22007(e) creates no conflict with § 1982. The latter statute is triggered only if government or private action at least "impair[s] a property interest." *Gerber v. Herskovitz,* 14 F.4th 500, 510 (6th Cir. 2021). To the Farmers' minds, the deceased-farmer exclusion does so by failing to redress prior USDA discrimination that reduced the value of their ancestors' land. But any "impair[ment]" complained of here derives from prior USDA actions, not from § 22007(e) or the USDA's implementation of it. In short, § 22007(e) impairs no one's right to inherit property.

f. Finally, in their motion for an injunction pending appeal, the Farmers cite *Loper Bright*, urging us to apply our independent judgment rather than deferring to the USDA's understanding of § 22007(e). *See* 144 S. Ct. at 2273. But we have done just that, as *Loper Bright* commands.

B. Turning from the APA to the Constitution, the Farmers also claim that excluding their claims violated the Fifth Amendment's Due Process Clause. To show a violation of procedural due process, the Farmers must (1) identify a life, liberty, or property interest; (2) show that they have been deprived of that interest; and (3) explain why the process used in the deprivation was inadequate. *Fields v. Henry County*, 701 F.3d 180, 185 (6th Cir. 2012) (citing *Women's Med. Pro. Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006)). Beyond a few naked assertions of illegality, however, they do not even attempt to do so, once again forfeiting the point. *Buetenmiller v. Macomb Cnty. Jail*, 53 F.4th 939, 946 (6th Cir. 2022) ("In instances where issues are adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, we consider them forfeited." (citation modified)). And peeking at the unbriefed merits, it bears noting that the Farmers have no due-process-protected property interest in the "benefit" program created here, given that the governing statute, as explained above, affords

them no "claim of entitlement to th[at] benefit." *Perry v. Sinderman*, 408 U.S. 593, 601 (1972). For both reasons, this claim likewise fails.

\*     \*     \*     \*     \*

We affirm the district court's judgment and deny the motion for an injunction pending appeal as moot.

---

**CONCURRENCE / DISSENT**

---

HELENE N. WHITE, Circuit Judge, concurring in part and dissenting in part.

I agree with portions of the majority's analysis but write separately to emphasize that there clearly is a compensatory element to Congress's choice of the term "assistance."

First, recovery under this provision is measured by the "consequences" flowing from past discrimination, a distinctly compensatory framing. This is in contrast to the majority's understanding that "assistance" connotes "something useful or necessary to achieving an end or completing an undertaking or effort"—i.e., a payment amount tied to the costs of that undertaking, not to the consequences of a past injury.

Second, to the extent that we can consider the *DFAP Guide*—a document not in the record or, seemingly, even known to the parties—it, too, suggests a compensatory element. For example, it permits payment to *former* farmers and "Potential Producers." *DFAP Guide* at 10, 15 (noting that (1) the term "Farmers" "includes applicants who—*at any point*—owned or leased a farming[] operation"; and (2) the term "Potential Producers" "includes applicants who *never* owned or leased a farming[] operation" (first emphasis added)). These individuals would not receive assistance, at least not in connection with any current farming efforts.

Still, I agree with the majority that the statute's use of "assistance" fairly contemplates that an applicant under § 22007(e) is capable of being assisted; i.e., that the applicant is alive to receive the payment. For that reason, I would hold that legacy claims brought on behalf of farmers who were alive when the statute took effect should be eligible for recovery, assuming they meet all other conditions.