NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0596n.06

Case No. 25-5152

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Dec 23, 2025
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF KENTUCKY |
| LESLIE BROCK, aka Paige Moore | ) | |
| Defendant-Appellant. | ) | O P I N I O N |
| | ) | |

Before: NALBANDIAN, DAVIS, and HERMANDORFER, Circuit Judges.

DAVIS, Circuit Judge. After returning to veterinary school in Auburn, Alabama, N.C.[1] started to experience withdrawals from fentanyl. She did not have a local dealer. So she asked Brendan Miller, a friend from back home in Kentucky, to send her some fentanyl. In response, Miller bought fentanyl from his supplier, Leslie Brock, and sent it to N.C. Within five days, N.C. was found dead in her apartment from intoxication by cocaine and fentanyl. A jury convicted Brock of one count of conspiracy to distribute fentanyl, the use of which resulted in N.C.'s death. Brock appeals her conviction on grounds that the evidence at trial was insufficient to show that fentanyl caused N.C.'s death or that Brock distributed the substance that caused N.C. to die. Because the jury's verdict was supported by adequate evidence of Brock's guilt, we AFFIRM.

---

[1] The decedent is identified by the initials "N.C." in the indictment. Thus, while her full name appears elsewhere in the record, we have elected to adopt the naming convention employed in the charging document.

**I.**

*A. Factual Background*

On August 20, 2023, Miller used a combination of his own money and funds N.C. had electronically sent him via CashApp to buy one gram of fentanyl from Brock. Miller separated out three-tenths of a gram of the drug, put it into a small baggie, and taped the baggie of fentanyl inside a greeting card. The card read, "Here you go, b[*]tch. Don't die" and "should have sent Narcan." (Trial Tr., R. 211, PageID 1095–96). He mailed the greeting card to N.C. on August 21.

On August 24, N.C. and Miller had a FaceTime call. During the call, N.C. said that she had used the fentanyl that Miller sent. And consistent with that representation, she appeared "very intoxicated," had "[s]lurred speech," "could barely hold her eyes open," and "was a little bit laggy." (*Id.* at PageID 1076, 1097). The next day, N.C. was found dead in her apartment. Fluid "had aspirated from her nose or mouth" and "crystalized." (Trial Tr., R. 210, PageID 994). And the blood pooling in her legs indicated that she had been there for a while.

On the breakfast bar in the kitchen, officers located Miller's greeting card, with the baggie of fentanyl still taped inside, and two straws. About one-tenth of a gram of fentanyl remained. Officers also found a vial of powder inside N.C.'s backpack in the kitchen and a bag of powder in her bedroom. They suspected the powders to be cocaine but did not submit either for testing. The toxicology lab reported that N.C. had cocaine, benzoylecgonine (a metabolite of cocaine), and fentanyl in her blood and oral cavity.

A few days after N.C.'s death, Miller told Brock that N.C. had died from the fentanyl she sold him. In spite of receiving this news, Brock continued to sell fentanyl to Miller. So, following officers' instructions, Miller conducted two controlled buys from Brock on October 4 and October

6. A few days after the second controlled buy, officers searched Brock's home and recovered 19.996 grams of a fentanyl analogue and 27.48 grams of actual methamphetamine.

### B. Procedural Background

A grand jury indicted Brock on one count of conspiring with Miller and others to knowingly and intentionally distribute 400 grams or more of a mixture or substance containing a detectable amount of fentanyl, the use of which resulted in the death of N.C., in violation of 21 U.S.C. §§ 841(a)(1) and 846. The case proceeded to trial.

At trial, the government presented testimony from Miller; Caleigh Cornett, who was N.C. and Miller's mutual friend; three police officers; and two people who helped Brock acquire drugs. Most relevant here, two additional witnesses testified about N.C.'s cause of death: Hannah Strickland, a forensic scientist, and Mike Ward, a retired toxicologist. The government also introduced N.C.'s death certificate, which listed her cause of death as intoxication by cocaine and fentanyl.

Strickland testified that N.C. had cocaine, benzoylecgonine, and fentanyl in her blood and oral cavity. Ward then explained that fentanyl hinders the user's "ability to breathe" and causes the user to "suffocate." (Trial Tr., R. 211, PageID 1199–1200). The level of fentanyl in N.C.'s blood, testified Ward, was "consistent with causing the death of an individual" and "could be a lethal level." (*Id.* at PageID 1198). A therapeutic level of fentanyl is one to three nanograms per milliliter. N.C.'s blood had fifteen nanograms per milliliter. Ward noted that death is "a fairly serious consequence" of ingesting fentanyl at five times the therapeutic level. (*Id.* at PageID 1200). He further opined that, if this level of fentanyl were not in N.C.'s blood, she "could very likely have survived." (*Id.*). Ward recognized that "[c]ocaine can effect [sic] the heart and certainly can contribute" to death. (*Id.* at PageID 1202). But he expressly stated that N.C. "no longer lived"

because of "the effects of that 15 nanograms per milliliter of fentanyl in [her] blood." (*Id.* at PageID 1200). And the lack of a fentanyl metabolite in N.C.'s blood, Ward opined, "indicate[d] a usage recent to her death." (*Id.* at PageID 1203).

At the close of the government's case-in-chief, Brock moved for a judgment of acquittal.[2] Once the defense elected not to present any proof, the district court denied Brock's motion. It found that the government had presented proof sufficient for the jury to find all the essential elements of the conspiracy charge.

The jury found Brock guilty as charged. And it specifically found that N.C. "would not have died but for the use of the same mixture or substance containing a detectable amount of fentanyl distributed by [Brock]." (Verdict Form, R. 165, PageID 548). The district court sentenced Brock to 250 months' imprisonment followed by five years' supervised release. Brock timely appealed.

## II.

We review de novo challenges to the sufficiency of the evidence. *United States v. Ray*, 803 F.3d 244, 262 (6th Cir. 2015). In doing so, we ask whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Pritchett*, 749 F.3d 417, 431 (6th Cir. 2014) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). A defendant challenging the sufficiency of the government's evidence "bears a very heavy burden." *United States v. Emmons*, 8 F.4th 454, 478 (6th Cir. 2021) (quoting *United States v. Abboud*, 438 F.3d 554, 589 (6th Cir. 2006)). We "view[] the evidence in the light most favorable

---

[2] On appeal, Brock advances arguments regarding the death-resulting enhancement only. Therefore, we need only address whether the government sufficiently proved the enhancement. *See Buetenmiller v. Macomb Cnty. Jail*, 53 F.4th 939, 946 (6th Cir. 2022) ("[I]n instances where '[i]ssues [are] adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation,' we consider them forfeited." (second and third alterations in original) (citation omitted)).

to the prosecution," *Pritchett*, 749 F.3d at 430–31 (citation omitted), and "draw all available inferences and resolve all issues of credibility in favor of the jury's verdict," *United States v. Jackson*, 470 F.3d 299, 309 (6th Cir. 2006) (citation omitted). As reviewers, we cannot "weigh the evidence presented, consider the credibility of witnesses, or substitute our judgment for that of the jury." *Id.* (citation omitted).

**III.**

Section 846 provides that "[a]ny person who . . . conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense." 21 U.S.C. § 846. The substantive offense found in § 841(a)(1) "prohibits the knowing or intentional distribution, or possession with the intent to distribute, of a controlled substance." *United States v. Sadler*, 24 F.4th 515, 544 (6th Cir. 2022) (citing 21 U.S.C. § 841(a)(1)). And § 841(b)(1)(C) enhances the penalty for a defendant who "violates § 841(a)(1) and 'death or serious bodily injury results from the use of [the distributed] substance.'" *Id.* at 545 (alteration in original) (quoting 21 U.S.C. § 841(b)(1)(C)). To prove a death-results enhancement pursuant to § 841(b)(1)(C), the government must show: (1) knowing or intentional distribution of a controlled substance; and (2) that death resulted from use of the distributed substance. *Burrage v. United States*, 571 U.S. 204, 210 (2014).

The distributed substance must be "either an independent, sufficient cause of the victim's death or a but-for cause." *United States v. Allen*, 716 F. App'x 447, 450 (6th Cir. 2017); *Burrage*, 571 U.S. at 218–19. "But-for causation exists where use of the controlled substance 'combines with other factors to produce' death, and death would not have occurred 'without the incremental effect' of the controlled substance." *United States v. Volkman*, 797 F.3d 377, 392 (6th Cir. 2015) (quoting *Burrage*, 571 U.S. at 211). This enhancement applies not only to individuals who directly

provided the controlled substance to the decedent, but also to others who were "in the chain of distribution that caused the victim's death or injury." *United States v. Williams*, 998 F.3d 716, 734 (6th Cir. 2021); *cf. United States v. Davis*, 970 F.3d 650, 656 (6th Cir. 2020) (holding that the government need not show any connection between the defendant and victim if the distributed drugs are "the same drugs that caused death").

### A. But-For Causation

Brock argues that the government failed to show that fentanyl was an independently sufficient or a but-for cause of N.C.'s death for two reasons. *First*, the death certificate listed both cocaine and fentanyl as causes of her death. *Second*, says Brock, Ward equivocated on whether N.C. would have died had she not taken the fentanyl. We disagree on both grounds.

*First*, the fact that the death certificate listed two substances as N.C.'s cause of death would not preclude a rational juror from finding that fentanyl was a but-for cause of her death. *See, e.g.*, *United States v. Hixon*, 838 F. App'x 961, 964 (6th Cir. 2020) (death certificate stating cause of death as "acute combined drug toxicity due to cocaine, fentanyl, and gabapentin" was not enough to overcome Ward's testimony that fentanyl was a but-for cause of death). Consistent with the death certificate, Strickland testified that N.C.'s blood tested positive for cocaine, a cocaine metabolite, and fentanyl. And Ward later testified that the lack of a fentanyl metabolite in N.C.'s blood suggests that she used fentanyl near her time of death. From this information, the jury was free to infer that because the cocaine had metabolized—and the fentanyl had not—the "incremental effect" of the fentanyl caused her death. *Volkman*, 797 F.3d at 392 (citation omitted).

*Second*, both Ward and Strickland provided unequivocal testimony from which a rational juror could deduce that fentanyl was a but-for cause of N.C.'s death. For example, Ward testified that fentanyl causes the user to "suffocate" because it impedes her "ability to breathe." (Trial Tr.,

R. 211, PageID 1199–1200). This testimony aligned with officers' observation that fluid had aspirated from N.C.'s nose or mouth and crystalized. If N.C. had not taken the fentanyl, stated Ward, she "could very likely have survived." (*Id.* at PageID 1200). Indeed, the fentanyl in her system was at least five times the therapeutic level—making death "a fairly serious consequence." (*Id.* at PageID 1198–1200).

True, Ward recognized that cocaine "certainly can contribute" to death. (*Id.* at PageID 1202). But this acknowledgment did not undermine his prior statement that "the reason that [N.C.] no longer lived was" due to "the effects of that . . . fentanyl." (*Id.* at PageID 1200). *See Sadler*, 24 F.4th at 547 (victim's positive reaction to Narcan "show[ed] that it was an opioid intoxication"); *United States v. Hamm*, 952 F.3d 728, 738 (6th Cir. 2020) (if the victim "had not had that level of carfentanil . . . he could have survived"); *Allen*, 716 F. App'x at 451 (fentanyl in victim's blood was lethal "to a medical certainty"); *United States v. Smith*, 656 F. App'x 70, 74 (6th Cir. 2016) (victim "would not have died had she not consumed oxycodone").

Brock's arguments challenging the certainty of Ward's testimony do not persuade. She contends that additional testimony was needed to strengthen Ward's, but this ignores Strickland's testimony about the cocaine metabolite. A rational juror could reason that the "marginal effect" of the fentanyl led to N.C.'s death, especially considering that the additional drug in her system had metabolized. *Hamm*, 952 F.3d at 738. And although she asserts that Ward did not testify "to a medical certainty," she does not address his direct statement that the fentanyl was "the reason that [N.C.] no longer lived." (Reply Br., ECF 34, 3 (citation omitted); Trial Tr., R. 211, PageID 1200).

Because the government presented sufficient evidence that fentanyl was a but-for cause of N.C.'s death, we need not decide whether the evidence supports a finding that fentanyl was an

independently sufficient cause to sustain Brock's conviction. *See Allen*, 716 F. App'x at 450; *Burrage*, 571 U.S. at 218–19.

### B. Distribution of Fentanyl

Brock does not contest that she sold fentanyl to Miller, nor that Miller mailed fentanyl to N.C. Instead, she asserts that she did not distribute cocaine, and therefore the government failed to show that she supplied the controlled substance that caused N.C.'s death. But the government presented circumstantial evidence sufficient to prove that Brock was in the chain of distribution for the fentanyl that was a but-for cause of N.C.'s death. *See Williams*, 998 F.3d at 734. So whether or not cocaine also may have contributed to her death was of no consequence to the jury's finding of guilt.

We agree with the government that Brock's second argument circles back to her first. The fact that N.C. had both fentanyl and cocaine in her blood pertains to causation, not distribution. The government charged Brock with distributing a mixture or substance containing fentanyl—not cocaine—and it presented evidence that fentanyl was a but-for cause of N.C.'s death. It was not required to account for the cocaine or otherwise "remove every reasonable hypothesis except that of guilt." *Sadler*, 24 F.4th at 539 (quoting *United States v. LaVictor*, 848 F.3d 428, 456 (6th Cir. 2017)).

Moreover, there was ample proof from which a rational juror could infer that the fentanyl that N.C. ingested came from Brock. To begin, there was a "tight temporal proximity" between Miller's purchase and N.C.'s death. *United States v. Simer*, 835 F. App'x 60, 65 (6th Cir. 2020). N.C. sent Miller $30 on August 14 to purchase fentanyl on her behalf. Miller purchased the fentanyl from Brock on August 20 and mailed it to N.C. the next day. Perhaps most tellingly, N.C. stated that she had used the fentanyl from Miller during a FaceTime call on August 24. And Miller,

who had "always been around people who used fentanyl," could tell that N.C. was high. (Trial Tr., R. 211, PageID 1097). N.C. died sometime between the end of this call and the following day. When she was found on August 25, the blood pooling in her legs suggested that "[s]he had been there for several hours, possibly overnight." (Trial Tr., R. 210, at PageID 998–99). In total, a mere five days separated Brock's sale of fentanyl to Miller and N.C.'s death.

Resisting this conclusion, Brock argues that "an unexplained gap in the evidence"— namely, the cocaine in N.C.'s system—precludes a finding of sufficiency. (Appellant's Br., ECF 22, 9). She cites *United States v. Ewing*, 749 F. App'x 317, 329 (6th Cir. 2018), for support. This unpublished decision does not help her cause, though. In *Ewing*, the government charged the defendant with distributing a mixture or substance containing heroin and fentanyl that caused the victim's death. *Id.* at 319. But neither heroin nor heroin metabolites were present in the victim's blood—only in his urine. *Id.* at 329. We held that, because the government had not offered any evidence to explain the absence of heroin in the victim's blood, it could not prove that the victim died due to the mixture that the defendant sold to him. *Id.* at 329–30.

Here, by contrast, there is no such "unexplained gap in the evidence." *Id.* at 329. The government's charge focused on Brock's involvement in a conspiracy to sell fentanyl, and fentanyl was in N.C.'s blood and oral cavity. Moreover, unlike the absence of the charged drug in the decedent's system in *Ewing*, the absence of cocaine in the drugs Brock distributed did not foreclose the possibility of the death-causing drug coming from Brock's stash. For the evidence showed that N.C. had no local fentanyl dealer and was in fentanyl withdrawal before Miller sent her the drug; the baggie of fentanyl he sent was the only illicit substance found both out in the open and near her body; and N.C. told Miller that she had taken the fentanyl he sent. As such, the presence of untested powders in N.C.'s apartment, and the detection of cocaine in her system, presented

"simply speculative possibilities already rejected by the jury" that we decline to revisit on appeal. *Simer*, 835 F. App'x at 66; *see also United States v. Assfy*, No. 20-1630, 2021 WL 2935359, at *6 (6th Cir. July 13, 2021) (rejecting a challenge based on *Ewing* because "there was no evidence that Assfy sold [the victim] fentanyl that was laced with a drug that did not appear in his blood").

In sum, the evidence was not so lacking that no rational juror could find in the government's favor.

**IV.**

For the foregoing reasons, we AFFIRM.